[Civ. No. 26773. Fourth Dist., Div. One. Feb. 23, 1984.]

BABBITT ENGINEERING & MACHINERY, INC., et al., Petitioners, v.
AGRICULTURAL LABOR RELATIONS BOARD, Respondent;
UNITED FARM WORKERS OF AMERICA, AFL-CIO,
Real Party in Interest.

314

## Counsel

John D. Collins, Christopher J. Martin, Elise C. Chaffin and Luce, Forward, Hamilton & Scripps for Petitioners.

Manuel M. Medeiros, Ruth Rokeach, Daniel G. Stone and Michael G. Lee for Respondent.

No appearance for Real Party in Interest.

## Opinion

STANIFORTH, J.—Babbitt Engineering & Machinery, Inc. (Babbitt), seeks review of a final order of the Agricultural Labor Relations Board (ALRB or Board) affirming the administrative law officer's (ALO) findings that Babbitt and San Marcos Greenhouses, Inc. (San Marcos)[1] had violated

---

[1]Babbitt changed the *corporate name* of the nursery on July 9, 1979, from Lewis Gardens, Inc., to San Marcos Greenhouses, Inc., some seven months after the purchase and several months after the discriminatory hirings and firings subject of this proceeding.

the Agricultural Labor Relations Act (ALRA) (Lab. Code, § 1141 et seq.) by (1) refusing to bargain with the United Farm Workers of America AFL-CIO (UFW or the Union), (2) engaging in a discriminatory campaign to refuse employment to former employees of Lewis Gardens, Inc. (Lewis) and (3) discriminatorily terminating three employees who had worked for Lewis. Based upon these findings the Board ordered a number of specific remedies, including payment of back wages to the affected employees. The unfair labor practices were alleged to have been committed by Babbitt after purchasing a nursery business from Lewis on January 21, 1979. Shortly before the sale of the nursery to Babbitt the UFW had won a decisive victory by unanimous vote in a representation election held among Lewis' employees.

While Babbitt has objected to a number of the ALRB's findings, the threshold issue concerns the propriety of the ALRB's determination that Babbitt was the "successor employer" to Lewis and in such capacity violated state labor law and was guilty of unfair labor practices.

FACTS

In September 1978, the ALRB had conducted an election among Lewis' agricultural workers. At that election by unanimous vote the employees designated the UFW as their representative. Thereafter, on January 18, 1979, the ALRB certified the UFW as the exclusive bargaining representative of Lewis' employees. Lewis had owned this business for many years. Lewis specializing in azaleas also raised and sold a variety of greenhouse plants. By the fall of 1978 Lewis' business was in bad economic circumstances. While the employees had numbered 46 in March 1970, by late 1978 there remained only a skeleton crew of 6 employees, all members of the Union.

Babbitt is a corporation engaged in consulting and design for heavy tube mills. The corporate stock is owned by Charles Babbitt (Mr. Babbitt). On January 21, 1979 (three days after the ALRB certification of the UFW), Babbitt entered into a sale-purchase agreement with Lewis whereby Babbitt acquired all of Lewis' common stock. Mrs. Babbitt became president of Lewis, Mr. Babbitt vice president and a third person secretary. These same three persons were also the officers of Babbitt.

By this agreement Babbitt acquired all assets of both Lewis' Whittier and Vista locations and the land at the Vista location. Babbitt purchased Lewis with the intent to continue the business as a nursery operation. Upon sale six Lewis employees remaining on the payroll continued in their jobs. The

nature of the operation remained essentially unchanged. Mrs. Babbitt managed the nursery business, continued azaleas as the major product line even after she discovered they were diseased. She paid the employees on Lewis' payroll checks until September 1979.

By letter dated January 24 the newly certified UFW wrote Lewis requesting bargaining. Donald Lewis (Mr. Lewis) received this letter and before January 29 showed it to Mrs. Babbitt. Mrs. Babbitt said she was not interested in discussing the union situation. A few days later Mrs. Babbitt flew to San Francisco to consult with the law firm of Bronson, Bronson and McKinnon on this labor matter. She had been advised by Mr. Lewis she should answer the UFW's request to bargain. Pursuant to legal advice received, Mr. Lewis drafted and sent a letter (dated Feb. 9) to the UFW informing it the business had been sold and the purchaser was seeking guidance concerning the UFW's request to bargain. Immediately after her trip to San Francisco, Mrs. Babbitt instructed Raul Vega, the person to whom she had delegated hiring authority, to stop hiring. Before her trip Vega had informed her the former Lewis employees were inquiring about reemployment. Shortly after the trip to San Francisco she fired Vega and commenced hiring herself.

On February 16, approximately two weeks after the sale, the UFW wrote directly to Mrs. Babbitt asserting Babbitt was the successor employer to Lewis and demanded to bargain. Following receipt of this letter Mrs. Babbitt again sought and obtained legal advice. Based upon the advice received she sent a letter (dated Mar. 9) stating—without citation of reason—she was not the successor employer and therefore would not bargain. Mrs. Babbitt also made statements about her predicament with the Union. She told one employee that with respect to the Union she had "inherited a bag of worms." On another occasion she received a telephone call about the Union and commented to the caller "Things are really fucked up around here, and I'm going to get to the bottom of this."

In the months of February and March approximately 20 former Lewis employees inquired about reemployment.[2] Of the nineteen new employees Mrs. Babbitt hired in February and March, only three were former Lewis employees; two, the Gastellums, had worked long before the Union election

---

[2]Specific evidence was introduced showing the following former Lewis employees requested employment but were never hired: Patricia Daltorio, Coronado Luna, Andres Gonzales, Reynaldo de Casas, Larry Montano, Pedro Gonzales, Socorro Vega, and Dorothy Van Ginder. Further, Duayne Giron, a former Lewis employee, inquired of supervisor Larry Montano concerning reemployment. Montano responded that Giron could not be hired because of his status as a former Lewis employee.

and the third, Larry Montano, was a supervisor. In this factual context the UFW initiated proceeding by filing charges on February 22, March 21 and 28 and June 7, 1979, alleging violations of the ALRA. After the adverse decision by the Board, Babbitt filed this petition for review pursuant to Labor Code section 1160.8.

## DISCUSSION

Fundamental to a determination of Babbitt's contention it did not engage in an illegal discriminatory campaign to hire or to fire former Lewis employees is the threshold question of the duties and obligations under the ALRA, incurred by Babbitt upon purchasing and undertaking the agricultural operations of Lewis. The administrative law officer examined the circumstances surrounding the change in the ownership and Babbitt's business operations at Lewis and concluded Babbitt was a "successor employer" to Lewis. The Board approved the ALO findings and held Babbitt succeeded to Lewis' obligations to recognize and bargain with the UFW, the Union that had just been officially certified as the exclusive bargaining representative at Lewis.

The California Supreme Court in *San Clemente Ranch, Ltd.* v. *Agricultural Labor Relations Bd.* (1981) 29 Cal.3d 874, 863-892 [176 Cal.Rptr. 768, 633 P.2d 964], spelled out with particularity the governing law concerning when a purchaser of an agricultural operation shall be deemed a "successor employer" and thereby obligated to recognize and bargain with the Union. (See also *Rivcom Corp.* v. *Agricultural Labor Relations Bd.* (1983) 34 Cal.3d 743, 764-765 [195 Cal.Rptr. 651, 670 P.2d 305].) Controlling California cases rely upon federal judicial and administrative National Labor Relations Board (NLRB) decisions in obedience to the Labor Code directive (§ 1148) to "follow applicable [NLRB] precedents." (See *N. L. R. B.* v. *Burns Security Services* (1972) 406 U.S. 272 [32 L.Ed.2d 61, 92 S.Ct. 1571] and *Howard Johnson Co.* v. *Hotel Employees* (1974) 417 U.S. 249 [41 L.Ed.2d 46, 94 S.Ct. 2236].)

I.

## THE FEDERAL PRECEDENTS

Neither the California act (ALRA) nor the federal act (National Labor Relations Act (NLRA)) contain any specific statutory provision dealing with the successorship issue.[3] The cases decided under the NLRA, however,

---

[3]But see the amendment to 1127 Labor Code in 1976 which defined a successor clause as in collective bargaining agreement in subdivision (c) of that provision but stated: "This section shall not apply to . . . any employer who is subject to the National Labor Relations Act [or the] Agricultural Labor Relations Act of 1975 . . . ."

have come to recognize the fundamental purposes of the act require the purchaser of a business to, in some circumstances, assume the statutory obligations of its predecessor. (See *National Labor Relations Board* v. *Colten* (6th Cir. 1939) 105 F.2d 179.) Since *Colten,* federal authorities have recognized the fundamental purposes of the NLRB required a new employing entity assume the statutory obligations of a predecessor employer in a great variety of circumstances beyond the technical changeover of ownership involved in *Colten.*[4] Successor liabilities have been imposed as a matter of law where the new employer purchased the entire business of the predecessor. (*N. L. R. B.* v. *McFarland* (10th Cir. 1962) 306 F.2d 219) or where the new employer acquires a part or all of the assets of its predecessor. (*N. L. R. B.* v. *Interstate 65 Corporation* (6th Cir. 1971) 453 F.2d 269.) And even where the new employer has not acquired any of the predecessor's assets but simply hired a majority or a substantial number of the employees of the predecessor bargaining unit, i.e., has taken over the workforce only, successorship employer obligations have been imposed. (*N. L. R. B.* v. *Burns Security Services, supra,* 406 U.S. 272.)

No single mechanical formula has been devised for determining whether an employer has succeeded to the bargaining obligations of its predecessor. The Supreme Court in *Howard Johnson Co.* v. *Hotel Employees, supra,* 417 U.S. 249, 256 [41 L.Ed.2d 46, 53], explained: "[W]e must necessarily proceed cautiously, in the traditional case-by-case approach of the common law. Particularly in light of the difficulty of the successorship question, the myriad factual circumstances and legal contexts in which it can arise, and the absence of congressional guidance as to its resolution, emphasis on the facts of each case as it arises is especially appropriate."

■ A number of factors, however, have come to be recognized as guideposts for determining whether an employer has succeeded to its predecessor's duty to bargain: "These factors include, *inter alia,* consideration of the continuity of workforce, continuity of business operations, similarity of supervisory personnel, similarity of product or service, similarity in methods of production, sales and inventorying, and use of the same plant." (*N. L. R. B.* v. *Security-Columbian Banknote Co.* (3d Cir. 1976) 541 F.2d 135, 139.) The cases decided under the NLRA have come to view as one

---

[4]Babbitt purchased the Lewis business assets through purchase of stock. The NLRB and our courts have treated as irrelevant the question of whether the transfer of employees and business took place technically by merger, consolidation, purchase of stock, purchase of assets, lease of assets, or some other form. These are matters which are usually governed by corporate or tax considerations rather than labor considerations. (Gorman, Basic Text on Labor Law, Unionization and Collective Bargaining, p. 119.) (See *N. L. R. B.* v. *Wayne Convalescent Center, Inc.* (6th Cir. 1972) 465 F.2d 1039.)

of the most important considerations the continuity of the workforce—the number of employees in the bargaining unit who had also worked for the predecessor employer. (See *Howard Johnson Co.* v. *Hotel Employees, supra,* 417 U.S. at pp. 263-264 [41 L.Ed.2d at p. 57].)

With regard to workforce continuity, the court in *N. L. R. B.* v. *Burns Security Services, supra,* 406 U.S. 272, 294-295 [32 L.Ed.2d 61, 77], stated: "[T]here will be instances in which it is perfectly clear that the new employer plans to retain all of the employees in the unit and in which it will be appropriate to have him initially consult with the employees' bargaining representative before he fixes terms. In other situations, however, it may not be clear until the successor employer has hired his full complement of employees that he has a duty to bargain with a union, since it will not be evident until then that the bargaining representative represents a majority of the employees in the unit . . . ."

Factually *Burns* involved the take-over of protection services for Lockheed Aircraft Service Co. at a California airport. Burns hired 27 of the previous guards and brought in 15 of its own guards but refused to bargain with the previous union or honor its labor contract. ■ The Supreme Court held when a company hires a majority of its workforce from the recently certified bargaining unit, and these employees continue to perform the same work in the same setting, the successor company is obligated to recognize and bargain with the incumbent union during the same period of time its predecessor was obligated. The Supreme Court said the Burns obligation to bargain with the union over terms and conditions of employment stem from its hiring of a majority of the employee workforce and from the recent election and board certification of the union. The Supreme Court held: "[A] mere change of employers or of ownership in the employing industry is not such an 'unusual circumstance' as to affect the force of the Board's certification within the normal operative period if a majority of employees after a change of ownership of management were employed by the preceding employer." (*N. L. R. B.* v. *Burns, supra,* at p. 279 [32 L.Ed.2d at p. 68].)

The *Burns* court points out this further rule of law. Where the party is found to be a successor employer and such employer refuses to hire or discriminatorily fires employees because of union affiliation, the employer commits a violation, an unfair labor practice, within the meaning of the act. (NLRA § 8 (a)(3).) The United States Supreme Court in *Howard Johnson Co.* v. *Hotel Employees, supra,* 417 U.S. 249, stated the latter rule succinctly. "Of course, it is an unfair labor practice for an employer to discriminate in hiring or retention of employees on the basis of union mem-

bership or activity under section 8(a)(3) of the National Labor Relations Act, 29 U.S.C. section 158(a)(3). Thus, a new owner could not refuse to hire the employees of his predecessor solely because they were union members or to avoid having to recognize the union." *(Id.,* at p. 262, fn. 8 [41 L.Ed.2d at p. 56].)

Where such a violation occurs, the remedy of the Board may include ordering of back pay for employees so discriminated against either by discriminatory firing or failure to hire. *(Tri State Maintenance Corporation* v. *N. L. R. B.* (D.C. Cir. 1968) 408 F.2d 171, 173; Lab. Code, § 1160.3.)

## II.

### THE CALIFORNIA LAW

The California Supreme Court in *San Clemente Ranch, Ltd.* v. *Agricultural Labor Relations Bd., supra,* 29 Cal.3d 874, concurred in the foregoing principles with appropriate adaptation due to the agricultural labor setting. The *San Clemente* court defined the principle legal question at issue: "[W]hether San Clemente was obligated to recognize and bargain with the UFW after purchasing Highland's assets and assuming control of its farming operations. As we have seen, approximately four months prior to the transfer of the ranch's ownership the UFW had won an overwhelming victory in a Board-conducted election among the ranches employees . . . ." *(Id.,* at p. 886.)

The California Supreme Court recognized there are a "great variety of factual circumstances in which successorship issues may arise, and because of the different legal consequences that may be at issue in different cases, *no single, mechanical formula can be devised to resolve all successorship issues,*" citing *Howard Johnson Co.* v. *Hotel Employees, supra,* 417 U.S. 249, 256 [41 L.Ed.2d 46, 53], and in such a context said: " '[W]e must necessarily proceed cautiously, in the traditional case-by-case approach of the common law. . . .' " *(San Clemente,* at p. 885.) *San Clemente* cites the *Howard Johnson* case additionally for the point " 'the real question . . . in each of these "successorship" cases is, on the particular facts, what are the legal obligations of the new employer to their employees of the former owner or their representative? . . .' " *(San Clemente,* at p. 886.)

The *San Clemente* court faced a factual problem almost parallel to that here presented. The former employer's assets and business property (as here) continued intact, but a number of employees who had been employed by San Clemente Ranch, Ltd., were not present. Thus the critical question

was the number of former employees who are essential to meet the federal precedent requirement of " 'workforce continuity.' " *San Clemente* (at p. 888) analyzed carefully the passage from *Burns* (406 U.S. at p. 295 [32 L.Ed.2d at p. 77]) where the United States Supreme Court said that in some situations "it may not be clear until the successor employer has hired his full complement of employees that he has a duty to bargain with a union" and distinguished the *Burns* rule: The agricultural setting in *San Clemente* was not readily equated and not necessarily controlled by the "full complement" discussion of *Burns*. The California Supreme Court described the typical agricultural setting. There is a high worker turnover in the agricultural business of this state—the employment is of a seasonal nature, the employees migrate throughout the state and the use of farm labor contractors and the "day haul" system is prevalent. (*San Clemente, supra,* 29 Cal.3d 874, 891.) The California Supreme Court concluded these various factors make the agricultural employee situation and workforce continuity a peculiar question distinct to agriculture in California. "[E]ven when no change in ownership occurs there is quite frequently a significant turnover in the workforce of the agricultural employer during the course of a single year. The California Legislature was, of course, fully aware of this phenomenon when it adopted the ALRA (see Lab. Code, § 1156.4), but nonetheless decided to provide a union which is victorious in a representative election with a one-year certification bar." (*San Clemente Ranch, Ltd.* v. *Agricultural Labor Relations Bd., supra,* 29 Cal.3d 874, 891.)

It is in light of the substantial turnover of an employer's workforce which is a "unique character of California's agriculture setting" that the requirement of the hiring of the "full complement" of the employees of the previous employer must be examined and determined.

At the time of the sale to Babbitt the number of Lewis' employees was at a low ebb (six). Yet, Babbitt before learning of its Union bargaining obligations retained all six of these persons, thus the then *total* workforce was hired. Babbitt immediately began to increase the number of persons hired; but after being made knowledgeable of the election of the Union to represent the workers the evidence is uncontradicted Babbitt fired Union activists and refused to hire former employees who had been active in the Union.

The ALO's findings were issued before *San Clemente* was decided; nevertheless the ALO carefully analyzed the workforce continuity factor in light of federal precedent before finding Babbitt had succeeded to Lewis' duty to bargain. The ALO intuited the *San Clemente,* reasoning "full complement"

does not necessarily mean "peak employment." This premise was patently true in this agricultural setting where seasonal fluctuations in the workforce would result in peak employment not being reached for many months after the change in ownership. Waiting until peak employment was reached to determine a new employer's duty to bargain could have deprived the agricultural employees of the benefits of representation for a substantial period of time.

The ALO resolved the "full complement" requirement: He did not wait until peak employment had been reached at the nursery to determine if Babbitt had a duty to bargain with UFW; instead, he waited until there was a representative complement of workers. The ALO found there was not such a complement when Babbitt first took over the nursery—only six employees were then working—and it was clear Babbitt intended to hire more employees soon.

The ALO determined a representative complement of employees had been reached by the beginning of March 1979. During February the workforce had increased from 12 to 22; it then stabilized and remained constant until the end of March. This stabilization, the ALO reasoned, indicated the nursery was receiving at least the minimal attention it needed and had reached a representative complement of employees. The ALO also felt it was of some significance the number of employees at the beginning of March was very close to the number of employees who were at Lewis at the time of the representation election. In light of these factors, the ALO's choice of the beginning of March as the date on which workforce continuity should be determined is certainly not unreasonable, and as a matter best left to the expertise of the Board, should not be disturbed. The Board, while rejecting the ALO's "overly mechanistic analysis concerning the factor of workforce continuity," affirmed the ALO's conclusion.

■ Looking only at workforce continuity, it is argued Babbitt did not succeed to Lewis' duty to bargain with the UFW—since a majority of its employees had not worked presale at Lewis. However, the effect of Babbitt's discharge of Union activist workers and refusal to hire former Lewis unionized employees must be brought into the legal equation. It was and is a controlling, overriding factor in determining this issue.

If it is manifest that but for the employer's discriminatory refusal to offer employment to the predecessor's unit employees, the Union would have continued to enjoy a majority representative status, continuity of workforce will be presumed. ■ An employer will not be permitted to rely upon its own wrongdoing and thus avoid its legal responsibilities. "Where such

conduct has occurred, continuity of the workforce will be presumed." (*Rivcom Corp.* v. *Agricultural Labor Relations Bd.*, *supra*, 34 Cal.3d 743, 764; *N. L. R. B.* v. *Foodway of El Paso* (5th Cir. 1974) 496 F.2d 117, 120; *Howard Johnson Co.* v. *Hotel Employees, supra*, 417 U.S. 249, 262, fn. 9 [41 L.Ed.2d at pp. 56-57].) As was succinctly stated in *Rivcom*: "*The issue* ['*workforce continuity*'] *is moot . . . in discriminatory-refusal-to-hire cases.*" (*Id.*, at p. 765, fn. 18; see also *K. B. & J. Young's Super Markets, Inc.* v. *N. L. R. B.* (9th Cir. 1967) 377 F.2d 463, 465, cert. den. 389 U.S. 841 [19 L.Ed.2d 105, 88 S.Ct. 71], 640 F.2d 1100.)

Despite the change of ownership, Lewis' agricultural operation (except the workforce whose continuity was disrupted by the unfair labor practices [discussed in III and IV, *infra*]) remained substantially the same, the same business and the same real property and equipment were used. Essentially the same product involved was sold in the same method of operation. The change in ownership brought no alteration in the nature or size of the bargaining unit. In light of this total continuity of the business' operations under Babbitt and the law-imposed presumption of workforce continuity (see sections III and IV, *infra*), the ALRB was justified in concluding Babbitt had succeeded to Lewis' bargaining obligations.

As in *San Clemente Ranch, Ltd.* v. *Agricultural Labor Relations Bd.*, *supra*, 29 Cal.3d 874, nothing in the continued representation of the employees of Babbitt by the UFW would in any way conflict with the purposes of the ALRA, and a failure to do so and recognize Babbitt's duty to bargain would undermine the protections sought to be secured by the ALRA's election procedures just completed at Lewis.

The ALRB's findings "shall be conclusive" on review "if supported by substantial evidence on the record as a whole." (*Tex-Cal. Land Management, Inc.* v. *Agricultural Labor Relations Bd.* (1979) 24 Cal.3d 335, 345 [156 Cal.Rptr. 1, 595 P.2d 579].) The factual record here fully supports the ALRB's finding Babbitt is the "successor employer" and should succeed to Lewis' bargaining obligations.

### III

The ALO as well as the Board made specific findings of unfair labor practices committed by Babbitt's discriminatory refusal to hire and discharge of former Lewis employees. The events evidencing the refusal to hire and the discharge of employees occurred within three months of Babbitt's acquisition of Lewis. Uncontradicted evidence shows these activities took place when Babbitt had knowledge of the Union's claim to represen-

tative status. By letter of January 24, the newly certified UFW wrote to Lewis requesting bargaining. Mrs. Babbitt was made aware of the letter but refused to bargain; instead she twice sought legal advice from a labor law firm. After obtaining legal advice and without statement of reasons she told the UFW (Mar. 29) she was not a successor employer and therefore would not bargain.

In the overall context of a refusal to bargain, does substantial evidence on the record as a whole support the Board's conclusion John Martinez, Salvador De Casas and Mary Hickey were discriminately discharged in violation of section 1153, subdivisions (a) and (c) of the Labor Code?

### A—DISCHARGE OF JOHN MARTINEZ

John Martinez was the president of the UFW organizing committee instrumental in securing representation of the UFW. He was a maintenance man working for Lewis since 1976 and had become head of packing and shipping. He also sold plants and drove a van. He was laid off from Lewis along with a group of other employees after the election. Mrs. Lewis was aware of Martinez' Union activities.

Martinez sought work from Mrs. Babbitt and was rehired February 5 to work at the nursery. When Mrs. Lewis learned of Martinez' rehire, she told Mrs. Babbitt that with respect to the Union, Martinez had caused trouble. During his one-week tenure under Babbitt, Martinez sold plants to customers and loaded trucks and worked under the direction of Raul and Oscar Vega. He had no authority to fire or hire or to direct work of any other employee. On the morning of February 12, one week after Martinez began work, Mrs. Babbitt called him into her office and terminated him, telling him he was no longer needed.

When Mrs. Babbitt fired Martinez the workforce was a total of 14, 7 of whom were former employees—still a majority of the Lewis workforce. The Board adopted the ALO's recommendation finding Babbitt had discharged Martinez because of his pro-union sentiments and as part of Mrs. Babbitt's discriminatory campaign against the Union, seeking to defeat the successorship obligation. Mrs. Babbitt knew of Martinez' Union activism. She testified Mrs. Lewis told her Martinez was a Union troublemaker. *Immediately* upon her learning she had hired a Union activist she fired him. The timing is a critical and often conclusive factor in determining whether a discriminatory motive for a discharge exists. (See *D. M. Rotary Press, Inc.* (1974) 208 N. L. R. B. 366, and cited cases.) From the

timing of the discharge the Board was justified in inferring an unlawful motive.

Secondly, Mrs. Babbitt's statement in justification of Martinez' firing was his services were no longer needed. This explanation is inconsistent with the record. Martinez had been fired after working but one week. Babbitt was at that time increasing, not decreasing, the workforce.

Finally, Babbitt claimed Martinez was fired because he was observed in a situation indicating involvement in a theft of plants. Mrs. Babbitt testified she saw Martinez loading a truck with the plants. The ALO found based upon testimony of other witnesses (Martinez and Hickey) that this was a fabrication; no such incident had in fact occurred. Where a purely fictional or false rationalization for layoff is tendered, such falsification rationally reinforces the Board's conclusion the motive for firing was improper. The appeal court in *Shattuck Denn Mining Corp. (Iron King Branch)* v. *N. L. R. B.* (9th Cir. 1966) 362 F.2d 466, 470, said: "If he [the trier of fact] finds that the stated motive for a discharge is false, he certainly can infer that there is another motive. More than that, he can infer that the motive is one that the employer desires to conceal—an unlawful motive—at least where, as in this case, the surrounding facts tend to reinforce that inference." The Board could draw such inference here.

 Babbitt contests the Board's finding Martinez was not a supervisor. In support of its contention Martinez was a supervisor, Babbitt argues: (1) Martinez was paid a salary; (2) he was hired to be in charge of sales and shipping; and (3) in making his finding, the ALO only took note of the conditions at the time Martinez was fired, and not the responsibilities he would be taking on when work picked up. According to Mrs. Babbitt, Martinez was hired to be in charge of sales and shipping; he would show the plants to customers, make out invoices, and "supervise" the loading of plants.

Martinez was to be paid a monthly salary of $850. While it is a circumstance to be considered, the fact an employee is paid a straight salary does not establish he is a supervisor. (*Filler Products, Inc.* v. *N. L. R. B.* (4th Cir. 1967) 376 F.2d 369, 375.) Martinez testified he sold plants, picked and tagged them, took invoices to the office, then loaded the plants for shipping. With the possible exception of the loading of plants, none of Martinez' job functions show any indicia of supervision. Martinez had no authority to hire and fire. He had no supervisory authority. He worked under the direction of the Vegas.

The act defines "supervisor" in Labor Code section 1140.4, subdivision (j): "The term 'supervisor' means any individual having the authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or the responsibility to direct them, or to adjust their grievances, or effectively to recommend such action, if, in connection with the foregoing, the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment." This foregoing evidence and the defining statutes are totally supportive of the Board's conclusion Martinez was not a supervisor and therefore not exempt from the law prohibiting discriminatory discharge.

 Finally, Mrs. Babbitt's statements and various actions authorized the ALO and the Board to reasonably infer an antiunion animus or motive on her part in the discharge of Martinez. For example, immediately following her consultation with the attorneys she ordered Raul Vega stop all hiring and took that control away from Vega. Vega had been the conduit through whom former employees requested reemployment. It could be reasonably inferred she sought to shut the door to unwanted job applicants. Her recited antiunion statements indicated an antiunion animus, an unlawful motive, in the firing.

### B—DISCHARGE OF MARY HICKEY

Mary Hickey worked for Lewis as an office clerk from August 1977 until November 1978 when she was laid off due to lack of work. At the time of the UFW election Hickey had been extremely active in Union activities and was elected secretary of the organizing committee. Her Union activities were well known to Lewis. Shortly after the Babbitt-Lewis purchase-sale was effected, Hickey contacted Mrs. Babbitt regarding reemployment. She was hired and began working February 2. When Mrs. Lewis learned of Hickey's rehire she (as with John Martinez) told Mrs. Babbitt that Hickey had caused trouble with respect to the Union. On February 14 Mrs. Babbitt discharged Hickey. When Hickey asked if there was something wrong with her work Mrs. Babbitt assured her there was not, stating only "it was bad timing for Hickey to be working at the nursery."

 The Board adopted the ALO's recommendation, finding that Mrs. Babbitt's discharge of Hickey was to contain unionism and was part of Babbitt's campaign to defeat the workforce continuity requirement for successorship. The Board was also justified in inferring unlawful motive from the timing of this discharge. Immediately after Mrs. Lewis told Babbitt that Hickey was a Union troublemaker, she was discharged. The discharge also

came after Mrs. Babbitt's trip to San Francisco to get legal advice from a labor attorney. She had just turned down the request for collective bargaining claiming not to be the successor employer.

Babbitt points to the other former Lewis employees who remained on the payroll and to the three former employees hired by Mrs. Babbitt. However, the rule does not require the company to discharge all former employees or . maintain a workforce devoid of a single employee who had worked for Lewis. It would be sufficient to avoid the obligation if the new employer (without resorting to unfair labor practices as the means) maintained a workforce with less than half the former employees. Mrs. Babbitt's quoted remark regarding "bad timing" circumstantially points to the intent to avoid the 50 percent former employee level. It is most significant that the three fired, Hickey, Martinez and Salvador De Casas, were very active Union supporters.

Babbitt's counsel contends there is no substantial evidence to support the conclusion of the Board's firing was related to an antiunion animus. Substantial evidence supports the conclusion Mrs. Babbitt had knowledge of Hickey's Union activity. Mrs. Babbitt's statements as to what Mrs. Lewis told her about Hickey and Martinez being troublemakers and her immediate response belies counsel's contention. The causal relationship between Hickey's termination and her Union activity may be inferred from such knowledge and the immediate discharge. (*Royal Packing Co.* v. *Agricultural Labor Relations Bd.* (1980) 101 Cal.App.3d 826, 834-835 [161 Cal.Rptr. 870].) Thus substantial evidence in the record when viewed as a whole support the finding Babbitt unlawfully discharged Hickey.

### C—DISCHARGE OF DE CASAS

Salvador De Casas had worked for Lewis since April 1976 doing general nursery work. He was one of the six employees who remained employed through the change of ownership. De Casas was a UFW activist serving as a substitute on the organizing committee. Supervisor Larry Montano was aware of his Union activities and communicated this knowledge to Mrs. Babbitt on the day immediately before she discharged De Casas. Although Montano testified he did not disclose this information concerning De Casas' activities on the organizing committee to Mrs. Babbitt, he was impeached by his earlier admission to general counsel that he had revealed De Casas' Union activities to Mrs. Babbitt. Moreover, the circumstances of Montano's change of story was suspicious. After his revelation to general counsel, but before testifying, he spoke with Mrs. Babbitt. He then came back to the hearing and denied telling Mrs. Babbitt of De Casas' Union connection.

When he was confronted with a change in his testimony he wavered. He admitted labeling De Casas a troublemaker to Mrs. Babbitt.

Two days before discharge, De Casas inquired of Mrs. Babbitt concerning a raise that had been promised by supervisor Raul Vega. Several workers were present during the conversation. Mrs. Babbitt responded to the effect that she, not Raul, was the person who would give a raise. She said she supposed she would give a raise and would speak to each worker the following Monday. The next Monday she called De Casas to the office and gave him no raise but his dismissal check. She claimed the company was not happy with his work. Before that discharge date neither Mrs. Babbitt nor anyone from the company had ever complained about De Casas' work performance. Mrs. Babbitt in fact admitted she had no criticism of De Casas' work. Instead, she "got bad vibes" from him during the initial interview. Furthermore she labeled him as a complainer about the difficulty of the work and the length of the work day.

█ Evidence of Mrs. Babbitt's knowledge of De Casas' Union activities comes from the testimony of Montano. The date this information was given to Mrs. Babbitt coincides exactly with the day De Casas was fired. It occurred two days after De Casas and several other employees approached Mrs. Babbitt, De Casas requesting a raise. It occurred during a time when Mrs. Babbitt was being pressed by the Union to negotiate and she was formulating her position that she was not the successor employer. Here again, as with Martinez and Hickey, the timing of De Casas' discharge gives rise to a rational inference of unlawful motive of antiunion animus.

Furthermore where complaint of work quality was the basis, the lack of warning is a factor traditionally relied upon by the NLRB to prove unlawful motive. (*Great Atlantic & Pacific Tea Co.* (1974) 210 N. L R. B. 593.) Mrs. Babbitt did not testify as to any poor work on De Casas' part. Instead she said he complained too often about working conditions. Thus Babbitt's position with respect to the cause for discharge shifted from poor work to excessive complaining to finally a position of seeming neutrality. A shifting defense may be an indication of unlawful motive. (*Don Pizzolato, Inc.* (1980) 249 N. L. R. B. 953.)

The foregoing evidence justified the Board in finding these three discharges unlawful. The record when viewed as a whole shows substantial evidence to support the conclusions drawn by the ALO and support the Board's order. The recited substantial evidence authorized the Board to draw an inference of a casual nexus between the discharges and Babbitt's antiunion animus. These three employees would not have been discharged

but for their Union activities and the Union activities were a moving or substantial cause for the discharge. (*Royal Packing Co.* v. *Agricultural Labor Relations Bd., supra,* 101 Cal.App.3d 826.)

## IV

Babbitt next contends the Board's conclusion Mrs. Babbitt engaged in a discriminatory campaign to *refuse to hire* former Lewis employees is not supported by substantial evidence on the record considered as a whole. The Board found that but for a discriminatory campaign to defeat successorship, Babbitt would have hired a significant number of former Lewis employees.

While an employer who purchases a business is free to select its own workforce, an employer who refuses, for the purpose of avoiding the union, to hire former employees is guilty of an unfair labor practice. (*Howard Johnson Co.* v. *Hotel Employees, supra,* 417 U.S. 249, 262, fn. 8 [41 L.Ed.2d 46, 56].) The new employer cannot avoid successorship status by a discriminatory refusal to hire the predecessor's workers. (*Rivcom Corp.* v. *Agricultural Labor Relations Bd., supra,* 34 Cal.3d 743, 764.)

The evidence when viewed as a whole on this issue reveals: Mrs. Babbitt became aware of the recent UFW certification at the end of January, shortly after the purchase of the business when Mr. Lewis showed her the UFW letter requesting bargaining. She was first, apparently, disinterested but then consulted a labor law firm concerning the obligation to the Union. Mrs. Babbitt disclosed this to the Union through Mr. Lewis. Her first action following her consultation with counsel was to insist Raul Vega stop all hiring. She took control over from Vega who had been approached by former employees seeking employment, thus cutting off the principal source of requests by Lewis employees for jobs. Mrs. Babbitt's March 9 letter to the UFW unequivocally refused to bargain. In it, she expressed her contention she was not a successor employer. Her antiunion comments she had "inherited a bag of worms," etc. support a finding of antiunion animus (*W. T. Grant Co.* (1974) 210 N. L. R. B. 622) as a basis for refusal to hire former unionized employees.

The numerical details of Mrs. Babbitt's hiring decision lends further support to the Board's finding she intended to defeat a finding of workforce continuity. At the time of the sale six Lewis employees remained on the payroll. Thus the total workforce was entirely former employees. On January 29 Babbitt hired three new employees. Then six out of nine employees were former employees. On February 2 Mrs. Babbitt hired Hickey and on

February 5 Martinez, both former employees. Thus at the beginning of February a majority of Babbitt's workforce was still comprised of former Lewis employees. It was after this hiring Mrs. Babbitt obtained legal advice concerning successorship duties. She then personally took over hiring. On February 12 she fired Martinez, bringing the total number of employees to 13, 7 of whom were former employees but still a majority. But by February 15 she had hired two new employees. On February 16 she fired Hickey and another employee, Oscar Vega. Of a total of 13 employees, then only 6, or a *less* than majority had worked for Lewis. And the following two days Babbitt hired two former Lewis employees, the Gastellums (not UFW activists) and she fired De Casas, one of the holdovers. Thus though she hired the Gastellums, only seven out of her employees had previously worked at Lewis. She hired Montano, a former supervising employee, on February 26. In sum, in February and March Mrs. Babbitt hired a total of 19 new employees but only 7 former Lewis employees remained. At the same time, the evidence is 20 former employees inquired about work, only 3 of whom—those mentioned above—were hired. None of the three hired were Union activist or supporters. This hiring picture may be rationally coupled with the firing of the three former employees who were the most active UFW supporters in her employ to support an inference of antiunion animus.

Mrs. Babbitt claims she did not know about inquiries from the 20 former employees seeking employment. Vega testified he told Mrs. Babbitt he was receiving inquiries from former employees. Her response to him was an instruction to stop hiring. A reasonable inference can be drawn she knew inquiries were being made and took immediate steps to prevent hiring.

Hickey specifically named seven former Lewis employees who called inquiring about reemployment. (See fn. 2, *ante*, p. 318.) Hickey testified she left approximately 10 messages on Mrs. Babbitt's spindle on her desk concerning these inquiries. A former employee, Van Ginder, telephoned; Hickey informed Mrs. Babbitt the call was from a former employee seeking reemployment. Mrs. Babbitt took the call. It is a fair and reasonable inference Mrs. Babbitt knew about the requests of former employees from several sources.

The Board reinstated an eighth employee, Giron, in addition to the seven named by Hickey as having specifically inquired about reemployment. The Board found Giron entitled to reinstatement because he sought reemployment from Montano and was told by him the former Lewis employees would not be rehired. ■ The rule is well established that an employer is responsible for the antiunion statements or acts of their supervisors whether or not the acts are specifically authorized. (*National Labor Relations Board*

v. *LaSalle Steel Co.* (7th Cir. 1949) 178 F.2d 829, cert. den. 339 U.S. 963 [94 L.Ed. 1372, 70 S.Ct. 996]; *Vista Verde Farms* v. *Agricultural Labor Relations Bd.* (1981) 29 Cal.3d 307, 320, 322 [172 Cal.Rptr. 720, 625 P.2d 263].) Babbitt is responsible for Montano's statement.

The ALO found Montano's denial of this statement to Giron untrue. This credibility resolution is neither patently incredible nor inherently improbable. It must be accepted by this court. (*Perry Farms, Inc.* v. *Agricultural Labor Relations Bd.* (1981) 86 Cal.App.3d 448, 463-464 [150 Cal.Rptr. 495].)

## V

### THE REMEDY

Having approved the ALRB's finding Babbitt guilty of unfair labor practices, we must now determine the propriety of the ALRB's remedial order.

An employer, who engages in a campaign of refusal to hire or fire its predecessor's employees for the purpose of defeating a successorship finding and its concomitant obligation to bargain, commits an unfair labor practice. Such conduct may authorize a Board's order to reinstate, with back pay, the predecessor's employees who were objects of the discrimination. (Lab. Code, § 1160.3; *Highland Ranch* v. *Agricultural Labor Relations Bd.* (1981) 29 Cal.3d 848, 862 [176 Cal.Rptr. 753, 633 P.2d 949]; *Polynesian Cultural Ctr., Inc.* v. *N. L. R. B.* (9th Cir. 1982) 582 F.2d 467, 475; *Alfred M. Lewis, Inc.* v. *N. L. R. B.* (9th Cir. 1982) 681 F.2d 1154, 1156.)

Babbitt argues the "make whole" remedy ordered here is contrary to law, citing *J. R. Norton Co.* v. *Agricultural Labor Relations Bd.* (1979) 26 Cal.3d 1 [160 Cal.Rptr. 710, 603 P.2d 1306]. The order requires Babbitt and San Marcos to: "Make whole all of their agricultural employees . . . for all losses of pay and other economic losses sustained by them as a result of Respondents' refusal to bargain with the UFW as such losses have been defined in *Adam Dairy dba Rancho Dos Rios* (Apr. 26 1978) 4 ALRB No. 24, as modified by *Ranch No. 1, Inc.* (July 14, 1980) 6 ALRB No. 37, for the period from February 22, 1979, until such time as Respondents commence good-faith collective bargaining with the UFW which leads either to a contract or a bona fide impasse."

Section 1160.3 of the Labor Code expressly permits the Board to issue an order requiring the employer to make its "employees whole, when

the board deems such relief appropriate, for the loss of pay resulting from the employer's refusal to bargain . . . ."

The make-whole remedy may not be ordered in *every* case where an employer's refusal to bargain had been found. The "per se" rule previously followed by the ALRB was reversed by the Supreme Court in *J. R. Norton Co.* v. *Agricultural Labor Relations Bd., supra,* 26 Cal.3d 1. Norton had filed a challenge to the validity of the representation election, in which the UFW had emerged as winner. The challenge was denied by the Board, which then certified the UFW. The employer had no right under the act to obtain direct judicial review of the Board's decision to certify a union. Norton refused to accede to the Board's decision, refused to bargain with the UFW, and the union filed an unfair labor practice charge against the company. The Board found Norton guilty of a refusal to bargain, ordered Norton to make whole its employees for any loss of pay suffered because of the refusal. Norton then sought judicial review of the Board's certification of the UFW.

The Supreme Court upheld the validity of the election and certification of the UFW but declared the Board's per se application of the make-whole remedy improper. The cause was remanded for a determination whether the remedy was appropriate under the facts of the case. The Supreme Court reasoned judicial review, as a check on arbitrary administrative action and a protection of the integrity of representative elections, was necessary for the proper functioning of the act. While the make-whole remedy is properly imposed when the election challenge is frivolous or not in good faith, the "blanket rule for the application of the make-whole remedy does not provide a sufficient guarantee that the integrity of representation elections will be preserved." (*J. R. Norton Co., supra,* 26 Cal.3d at p. 35.)

Second, the Supreme Court looked at the language of Labor Code section 1160.3 authorizing the make-whole remedy when the Board "deems such relief appropriate." By its per se application of the remedy, the court held, the Board rendered the quoted language surplusage. The language of the section and its legislative history "reveals the Act did not intend make-whole relief to be applied on an across-the-board basis." (*J. R. Norton Co.,* at p. 38.) *Norton* requires the Board to "examine the facts and equities of each particular case" (*id.,* at p. 38; fn. omitted) before it orders make-whole relief.

Babbitt argues the Board here did not fulfill this requirement. The ALO, in considering the remedy's appropriateness, stated: "Having concluded that Respondents violated their duty as successors to bargain with the UFW and

having found this refusal to be tinged with anti-union animus, make-whole relief is clearly appropriate." *Norton* does not require a written statement of reasons for the remedy's appropriateness; rather, *the Board must determine whether it is appropriate.*

 Under the facts of this case, the remedy is appropriate.

The court in *Norton* couches its test for the suitability of the remedy in terms fitting the context of that case, a "technical refusal to bargain." "On remand, the Board must determine from the totality of the employer's conduct whether it went through the motions of contesting the election results as an elaborate pretense to avoid bargaining or whether it *litigated in a reasonable good faith belief that the union would not have been freely selected by the employees as their bargaining representative had the election been properly conducted.*" (*J. R. Norton Co.* v. *Agricultural Labor Relations.Bd.*, *supra*, 26 Cal.3d at p. 39; italics added.)

The *Norton* court's primary concern is with the employer's good faith—did the employer have a reasonable, good-faith belief its actions were in keeping with the policy of the act. The *Norton* decision required the Board to determine whether Babbitt had a reasonable good-faith belief it had not succeeded to Lewis' duty to bargain with the UFW, or alternatively whether its position was pretextual, taken only to avoid having to bargain with the Union. This precise question was explicitly decided by the Board's finding Babbitt had engaged in a discriminatory campaign against former Lewis employees and to avoid successorship obligations to bargain. Had Babbitt a good-faith belief it had no duty to bargain with the UFW, it would not have engaged in acts designed to defeat a finding of successorship.

Finally, Babbitt relies upon *San Clemente Ranch, Ltd.* v. *Agricultural Labor Relations Bd.*, *supra*, 29 Cal.3d 874, the California Supreme Court's first successorship case under the act. The *San Clemente* court set aside the Board's make-whole order and remanded the cause for consideration in light of *Norton*. Babbitt argues, it, like the employer in *San Clemente*, did not believe it had succeeded to its predecessor's duty to bargain, so the make-whole order in this case should also be set aside.

The Board's decision in *San Clemente* was made before *Norton* had been decided. The Board's decision in the instant case was made over two years after *Norton* was decided. No unknowing application of the per se rule was involved here. Further, in *San Clemente* there was no finding of bad faith on the employer's part—the contest was solely a legal question of successorship; *San Clemente had not engaged in discriminatory actions designed*

*to defeat a finding of successorship as found here.* "The Board in its presumed expertise must be given relatively free reign in determining which remedy will best effectuate the policies of the act. It is only when the remedies ordered by the Board are patently outside the Board's authority that a reviewing court can interfere." (*Jasmine Vineyards, Inc.* v. *Agricultural Labor Relations Bd.* (1980) 113 Cal.App.3d 968, 982 [170 Cal.Rptr. 510].) The Board's make-whole award fulfills the requirements enunciated in *Norton*. As it cannot be said the Board was "patently outside" its authority in ordering make-whole relief in this case, the order should not be disturbed on appeal.

■■ ■■■■ The order of the Board is affirmed;[5] the cause remanded for compliance hearing pursuant to the make-whole portion of the order under review.

Butler, J., concurred.

**COLOGNE, Acting P. J.**—I must respectfully dissent. I view this as another example of the Board's reaching beyond the evidence to impose sanctions on the agricultural employer. I am well aware of the standard of review this court must observe in addressing the issues, but I will restate them in the manner I have done more than once in ALRB cases.

The findings of the Board as to questions of fact are conclusive if supported by substantial evidence on the record considered as a whole (Lab. Code, § 1160.8). The standard of review by this court is met if there is relevant evidence in the record which a reasonable mind might accept in

---

[5]The ALO—for reasons not clear—found San Marcos was the alter ego of Babbitt. This conclusion is not necessary or relevant in any way to this court's, the Board's or the ALO's determination Babbitt is the successor employer to Lewis. The factual situation presented in this case does not call into play the rules for determination of alter ego status of San Marcos. As the record shows there was a change of name several months after the refusal to bargain and discriminatory firing/hiring occurred. There certainly may be an appropriate factual context in a case for the application of the alter ego doctrine. (*Hood Industries, Inc.* (1980) 248 N. L. R. B. 597) But this case does not call for such a finding and therefore it should be disregarded. Babbitt and San Marcos are parties to this proceeding, both are bound by the decision of the Board and this court. Counsel for the employer assures us that neither "Babbitt nor San Marcos or the principals may try to hide funds or transfer them back and forth or otherwise avoid responsibilities through corporate machinations." We take counsel at his word and find no relevance or need for application of the alter ego doctrine. Under the NLRA an employer committing an unfair labor practice cannot avoid a remedial order simply by changing its corporate form. The order could be issued directly to the alter ego as well as the wrongdoer itself on a theory of agency, alter ego or successorship. The same rule would certainly apply to cases, if factually warranted, arising under the ALRA. (*National Labor Relations Board* v. *Hopwood R. Co.* (2d Cir. 1938) 98 F.2d 97, (2d Cir. 1939) 104 F.2d 302, 304; and *Walling* v. *Reuter Co.* (1944) 321 U.S. 671 [88 L.Ed. 1001, 64 S.Ct. 826].)

support of the findings (*Kawano, Inc.* v. *Agricultural Labor Relations Bd.* (1980) 106 Cal.App.3d 937, 943 [165 Cal.Rptr. 492]). The United States Supreme Court gives us further guidance in *Universal Camera Corp.* v. *Labor Bd.* (1951) 340 U.S. 474, 487-488 [95 L.Ed. 456, 467, 71 S.Ct. 456, 464-465]. "Whether or not it was ever permissible for courts to determine the substantiality of evidence supporting a Labor Board decision merely on the basis of evidence which in and of itself justified it, without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn, the new legislation definitively precludes such a theory of review and bars its practice. The substantiality of evidence must take into account whatever in the record fairly detracts from its weight. This is clearly the significance of the requirement in both statutes that courts consider the whole record. . . .

"To be sure, the requirement for canvassing 'the whole record' in order to ascertain substantiality does not furnish a calculus of value by which a reviewing court can assess the evidence. Nor was it intended to negative the function of the Labor Board as one of those agencies presumably equipped or informed by experience to deal with a specialized field of knowledge, whose findings within that field carry the authority of an expertness which courts do not possess and therefore must respect. Nor does it mean that even as to matters not requiring expertise a court may displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*. Congress has merely made it clear that a reviewing court is not barred from setting aside a Board decision when it cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view."

It has also been phrased this way: "This 'limited' scope of review does not, however, require us to abdicate our responsibility to the extent of merely 'rubber-stamping' our affirmance of the Board's decision when, after full review of the record, including the evidence opposed to the Board's views, we are unable conscientiously to conclude that the evidence supporting such decision is substantial." (*N. L. R. B.* v. *O. A. Fuller Super Markets, Inc.* (5th Cir. 1967) 374 F.2d 197, 200; *Universal Camera Corp.* v. *Labor Bd.*, *supra*, 340 U.S. 474, 488 [95 L.Ed. 456, 467].)

The court is to be guided in its review of Board orders by decisions under the National Labor Relations Act (29 U.S.C.A. § 151 et seq.), on which the Agricultural Labor Relations Act was modeled (Lab. Code, § 1148).

"Substantial evidence" does not mean "any evidence" (*Sunnyside Nurseries, Inc.* v. *Agricultural Labor Relations Bd.* (1979) 93 Cal.App.3d 922, 930-931 [156 Cal.Rptr. 152]), and is not established by mere suspicions of unlawful motivation (*Lozano Enterprises* v. *N. L. R. B.* (9th Cir. 1966) 357 F.2d 500, 503). General counsel of the Board has the burden of proving unlawful conduct, and such conduct is not lightly to be inferred (*N. L. R. B.* v. *Federal Pacific Electric Company* (5th Cir. 1971) 441 F.2d 765, 770).

I must reluctantly repeat the facts as I feel the majority's view of the evidence omits some very salient matters which cast a different light when we view the *whole record* in accord with the foregoing principles.

Lewis Gardens, Inc., a nursery with locations in both Vista and Whittier, was owned by Hubert and Helen Lewis. It specialized in azaleas, and also raised and sold a variety of greenhouse plants. It is not the usual agricultural enterprise with a high level of seasonal hiring at harvest time but rather, like most individual businesses, has a relatively constant level of employment. Although the Lewises had operated the nursery for many years, by the Fall of 1978 the business was failing. The number of employees at the Vista location had dwindled from 46 in March 1978 to 15 in October 1978. When the Lewises sold the nursery there were only six employees left. It lacked responsible management and the $1 million inventory of plants was poorly cared for, diseased and in jeopardy of being totally lost. The type of plant production was vastly over diversified.

Babbitt Engineering is a corporation engaged in the business of consulting and design with regard to heavy tube mills. All of the corporation's stock is owned by Charles Babbitt. In December of 1978 Virginia Babbitt, Charles' wife and Babbitt's vice-president, first looked over the Lewis' property. Mrs. Babbitt was searching for a business which could be "turned around," and had heard Lewis Gardens might be such a business.

January 21, 1979, Babbitt Engineering entered into a sales agreement with the Lewises for the purchase of the business. Under the terms of sale, Babbitt acquired all of the common stock of Lewis Gardens, it being understood the real property in Whittier had been sold to a developer and was no longer an asset of the corporation.

With the change in corporate ownership came a change in corporate officers—Mrs. Babbitt became president of Lewis Gardens, Mr. Babbitt vice president, and Marsha Iacco secretary. These three were also the only officers of Babbitt Engineering, where Mr. Babbitt is president, Mrs. Babbitt vice president, and Iacco secretary. Mrs. Babbitt, by all accounts, actually

ran the nursery without assistance from the others. Mr. Babbitt played no role in managing the nursery business.

On July 9, 1979, a certificate of amendment was filed with the Secretary of State, changing the name of the nursery to San Marcos Greenhouses, Inc. No other changes were made in the structure of the corporation, but substantial changes were made in the operation and management. Prior to the sale, the Whittier plant was the main sales point with sales to flower shops, retail plant stores and supermarkets. This part of the business was closed down completely. The Vista plant which had been only a location for "back door" sales to retailers became the only point of operation. A new sales manager was hired and he initiated a number of changes in the operation. For example, the number of varieties of plants being produced was limited, sales methods were completely changed, staff realigned, the diseased plants were removed and the stock generally upgraded. About all that could be said of the continuity of the business was it was still a corporation and was in the business of growing some kind of greenhouse plants.

Around February of 1979, after Babbitt had bought Lewis Gardens but before its name was legally changed, events took place at the nursery which led to the filing of this unfair labor practice proceeding. The union requested a meeting to negotiate the wage contract and Mrs. Babbitt, as president of Lewis, initially ignored it, assuming she was a new employer not bound to negotiate with the UFW which had been certified as the bargaining agent to Lewis Gardens. Lewis prevailed on Mrs. Babbitt to consult an attorney, which she did, and then notified UFW she would not negotiate. UFW filed these charges and the Board issued a complaint naming Babbitt as respondent. In its answer, Babbitt denied the charges, and also denied it was engaged in agriculture, claiming instead its "subsidiary corporation, San Marcos Greenhouses," was so engaged. In a later amendment to the complaint San Marcos was added as a corespondent in the case. At all stages of these proceedings, attorneys originally hired by Babbitt handled the representation of both Babbitt and San Marcos.

DISCUSSION

*Babbitt as Alter Ego or Successor Employer*

The majority opinion treats the matter of alter ego lightly in its final footnote, but I cannot ignore the issue. The Board's finding exemplifies how it reaches conclusions not supported by the record; moreover, it provides the means whereby the engineering firm is drawn into the fray and made a party to these proceedings. Assuming San Marcos was a successor employ-

er, there is no evidence beyond Babbitt's ownership of the shares of San Marcos and similarity, though not identity, of corporate officers to warrant application of the alter ego doctrine to Babbitt. The evidence is Mr. Babbitt and Babbitt took no part in the management of San Marcos. The San Marcos operation was entirely undertaken by Mrs. Babbitt as president of San Marcos. Nor is there any evidence of Babbitt's "assuming control of [San Marcos' agricultural] operations" (see *San Clemente Ranch, Ltd.* v. *Agricultural Labor Relations Bd.* (1981) 29 Cal.3d 874, 886 [176 Cal.Rptr. 768, 633 P.2d 964]), thus an essential element of the successor employer doctrine cannot be shown in Babbitt's case.

In his decision, the ALO found: "Babbitt Engineering as the sole owner of Lewis Gardens, later renamed San Marcos Greenhouses, Inc., is the *alter ego* of its subsidiary and properly named as Co-Respondent. (*Hood Industries, Inc.*, 248 NLRB No. 89 (1980)."

This is the ALO's only comment on the issue; it is not supported by any findings, nor discussed anywhere else in the decision. Although challenged in the exceptions to the ALO's decision, the Board does not mention this finding (other than to generally affirm the ALO's findings). In its petition for review Babbitt contends the ALO's alter ego finding is not supported by substantial evidence, and in any case cannot stand as the ALO did not make any of the findings required before the alter ego doctrine can be invoked.

At oral argument, counsel for Babbitt made clear it was not attempting to hide behind this theory, but he gave no indication he would abandon that issue. Factually, the situation here does not involve a change in corporate form to avoid a remedial order. The only change involved was in the name of the same corporate entity, "Lewis Gardens, Inc." to "San Marcos Greenhouses, Inc." "[T]he rule is well settled in this state that the mere fact one or two individuals or corporations own all of the stock of another corporation is not of itself sufficient to cause the courts to disregard the corporate entity of the last corporation and to treat it as the *alter ego* of the individual or corporation that owns its stock. In addition it must be shown that there is such a unity of interest and ownership that the individuality of such corporation and the owner or owners of its stock has ceased; and it must further appear that the observance of the fiction of separate existence would, under the circumstances, sanction a fraud or promote injustice. Bad faith in one form or another must be shown before the court may disregard the fiction of separate corporate existence." (*Cleaning & Co.* v. *Hollywood Service* (1932) 217 Cal. 124, 129 [17 P.2d 709]).

The authorities all agree the test for alter ego, or "piercing the corporate veil," is two-pronged. Both a unity of interest and ownership between the

corporations, and some inequity, fraud, or frustration of statutory purpose which would result from the observance of the corporations' separate identities, must be shown (*Penntech Papers, Inc.* v. *N. L. R. B.* (1st Cir. 1983) 706 F.2d 18, 24; 6 Witkin, Summary of Cal. Law (8th ed. 1974) Corporations, § 6, p. 4318; 1 Fletcher, Cyclopedia of Corporations (1982 pocket supp.) § 41, p. 29). Neither the ALO's findings nor the record in this case satisfy these requirements.

The only indicia of a unity of interest and ownership between Babbitt and San Marcos mentioned by the ALO is Babbitt's ownership of all of the stock of San Marcos. The only other evidence of such a unity we can find between the two corporations is the shared corporate officers, though the holders of the top two positions are distinctively different. These two facts are not by themselves enough to support a finding of alter ego (19 Am.Jur.2d (1965) Corporations, § 716, pp. 216-217).

The record reveals one other fact which might suggest a unity of interest and ownership—Babbitt and San Marcos shared representation by a single firm of attorneys who defended all of the charges in the case.[1] Although the law firm never expressly claimed to be representing only Babbitt, it did effectively represent both parties. While use of the same attorneys might suggest a common interest, it does not satisfy the tests for alter ego established by the NLRB and ALRB.

The alter ego analysis involves the same factors as the test for a "single employer" under the N.L.R.A., only the finding of alter ego also requires a finding of some form of bad faith motive (*Carpenters Local U. No. 1846* v. *Pratt-Farnsworth* (5th Cir. 1982) 690 F.2d 489, 507-508). The NLRB determines whether two corporations are a "single employer" for the purposes of the act by looking for: "(a) a present unity of interest, (b) common ownership and control, (c) interdependence of operations, and (d) common direction of labor relations policies." (Morris, The Developing Labor Law (1971) p. 768.)

The ALRB's test for a "single employer" is similar: "Because patterns of ownership and management are so varied and fluid, we are reluctant to

---

[1]No formal appearance was ever made by San Marcos, but at the hearings before the Board it was assumed by both parties San Marcos had made an appearance and the attorneys originally appearing for Babbitt were presenting the arguments for both respondents. At oral argument, San Marcos asserted the failure to make a formal appearance for it was an oversight. The representation of San Marcos as a party to this petition was apparent in the briefs and at all proceedings, and no prejudice was seen by San Marcos' oversight in not having made a formal appearance. It was only a clerical error. Formal appearance was requested after the matter was brought to San Marcos' attention and the request was granted.

announce any mechanical rule in these cases; but we will look to such factors as similarity of the operations, interchange of employees, common management, common labor relations policy, and common ownership." (*Louis Delfino Co.* (1977) 3 ALRB No. 2, p. 3.)

The ALO's finding only addresses one of the factors from either of the tests, common ownership. The evidence in the record only suggests one other possible factor—common control (the shared corporate officers). There is nothing in the record to suggest the engineering company had any role or interest in the operation of the nursery. The ALO made it clear it was Mrs. Babbitt who took firm control of the operation of San Marcos as its president and there was no evidence she had any role in the engineering business. There was no showing of any similarity in operations between Babbitt, a heavy tube mill designer, and San Marcos, a nursery. No evidence was introduced of any interchange of employees between Babbitt and the nursery. No common accounting or management of the two corporations was shown. There was no evidence of any common labor relations policy. "The standards for the application of alter ego principles are high, and the imposition of liability notwithstanding the corporate shield is to be exercised reluctantly and cautiously." (1 Fletcher, Cyclopedia of Corporations (1982 pocket supp.) § 41.1, p. 33.)

The finding of the ALO clearly does not support the invocation of the alter ego doctrine. Further, the evidence in the record also would not appear to show such unity of interest and ownership as is necessary for the doctrine's use. The first prong of the test for the alter ego doctrine was, therefore, not satisfied.

Neither the ALO nor the Board give any consideration to the second requirement for piercing the corporate veil—the occurrence of some inequity, fraud, or frustration of statutory purpose if the corporate structure is not disregarded. In this requirement lies the purpose for the doctrine. "The *alter ego* doctrine is applied to avoid inequitable results not to eliminate the consequences of corporate operations." (*Aladdin Oil Corp.* v. *Perluss* (1964) 230 Cal.App.2d 603, 614 [41 Cal.Rptr. 239].) A search of the record in this case, however, reveals no inequity or frustration of statutory policy which would result if the doctrine were not used; indeed, one can only speculate as to the ALO's reason for applying it.

To summarize, it becomes apparent the record is devoid of any evidence, let alone substantial evidence, upon which to premise the "alter ego" finding. This being the case, the ALO's "alter ego" finding should be reversed. Babbitt's separate corporate existence should be recognized, and as it played

no role in the unfair labor practices at issue in this case, either as alter ego or successor employer, and regardless of the holding as to San Marcos, Babbitt should be dismissed as a party.

### Discriminatory Discharges

Along with the campaign to refuse to hire former Lewis Gardens employees, the employer here was additionally charged with illegally firing three of its employees who also had worked at Lewis Gardens. The ALO found the three, Mary Hickey, Salvador De Casas and John Martinez, were discharged because of their past employment at Lewis Gardens, and because of their union activity while there. The Board affirmed this finding.

Section 1153, subdivision (c) of the act makes it an unfair labor practice for an employer to discriminate "in regard to the hiring or tenure of employment, or any term or condition of employment, to encourage or discourage membership in any labor organization." The Board has held: "To establish a prima facie case of discriminatory discharge in violation of Section 1153(c) and (a) of the Act, the General Counsel is obliged to prove by a preponderance of the evidence that the employee was engaged in union activity, . . . and that there was some connection or causal relationship between the union activity and the discharge." (*Jackson & Perkins Rose Co.* (1979) 5 ALRB No. 20, p. 5.)

Once general counsel has shown an employee's union activities were a motivating factor in the employer's decision to discharge the employee, the burden shifts to the employer to prove the discharge would have occurred regardless of the union activity. If the employer fails to carry this burden, and the employee would have been retained "but for" his union membership, or his performance of other protected activities, the discharge is an unfair labor practice. (*Martori Brothers Distributors* v. *Agricultural Labor Relations Bd.* (1981) 29 Cal.3d 721, 729-730 [175 Cal.Rptr. 626, 631 P.2d 60]; *Wright Line* (1980) 251 N. L. R. B. 1083 enforced 662 F.2d 899 (1st Cir. 1981).)

With these standards for review in mind, the three discharges will be examined individually.

### A. *Mary Hickey*

Mrs. Hickey had worked in the office at Lewis Gardens from August 1977 until November 1978. Her duties there included keeping the payroll, maintaining personnel records, writing out sales slips, making up deposits, and

taking incoming phone calls. At the time of the UFW organizational drive at Lewis Gardens, Hickey had been elected secretary of the organizing committee.

Hickey contacted Mrs. Babbitt regarding employment soon after Babbitt bought the nursery. Mrs. Babbitt hired her, and she began work in the office on February 2. February 14, less than two weeks after she started, Hickey was let go by Mrs. Babbitt. According to Mrs. Babbitt, Hickey voluntarily quit, saying she felt "uncomfortable" in the position. Hickey denies this and claims she was fired by Mrs. Babbitt. Hickey was given a pink slip by Mrs. Babbitt which gave as the reason for her discharge: "Reorganization within company."

The ALO credited Hickey's version of the discharge. As this credibility resolution is neither incredible on its face nor inherently improbable, it must be accepted by this court. The ALO also found Hickey was discharged either because of her union activities while at Lewis Gardens or solely because she was a former Lewis Gardens employee, in violation of the Act. Substantial evidence at least supports the first basis.

San Marcos attacks the ALO's holding on two grounds. First, it argues a finding Mrs. Babbitt discharged Hickey because of her union activities at Lewis Gardens cannot stand, as there was no showing Mrs. Babbitt had any knowledge of Hickey's union activity.

The ALO's finding in this regard was: "Mrs. Babbitt was aware of Mary's previous employment and had discussed her with Mrs. Lewis who criticized her as a 'busybody' and a 'troublemaker.' Mrs. Babbitt did not admit awareness of union sympathy or activity on Mary's part, but given Mrs. Lewis propensity to criticism and gossip, I find it hard to believe that the ambiguous, almost euphemistic, term 'troublemaker' was not understood or actually connected with union activities."

From this, San Marcos argues, it is clear the ALO has based his finding Mrs. Babbitt had knowledge of Hickey's union activity on mere suspicion or surmise—he *guessed* at what Mrs. Lewis was *likely* to have said. This, it contends, is surely not substantial evidence.

The testimony on this point is, unfortunately, ambiguous. According to Mrs. Babbitt, Mrs. Lewis came to the nursery daily, and "volunteered information on everyone and everything." Referring to Hickey, Mrs. Lewis told her "She's a busybody and a troublemaker. You'll be sorry you hired her."

When asked whether Mrs. Lewis mentioned Hickey's involvement with the UFW, Mrs. Babbitt testified:

"A. I don't remember.

"Q. Do you remember Mrs. Lewis telling you or—yeah, Mrs. Lewis telling you that Mary had been a secretary of the Union when it had an organizer committee at Lewis Gardens?

"A. Not that she had been a secretary. That she had been there, but not that she had been a secretary.

"Q. That she'd been where?

"A. At Lewis Gardens during the Union, and I just didn't discuss it anymore."

The following exchange took place just a little later in Mrs. Babbitt's testimony:

"Q. . . . Do you recall the Lewises discussing any of their former employees with you, specifically in regard to their organizing activity around the time of the election campaign or the actual election at the Lewis Garden Nursery?

"A. Mrs. Lewis might have made mention of it. She was still very concerned about it; but that was during the first couple of days, and I was not in a position to talk about anything other than hiring people and marketing azaleas.

" . . . . . . . . . . . . . . . . . . .

"Q. After Mrs. Lewis realized that you had hired John Martinez and Mary Hickey, did she raise to you, discuss with you in any way, mention to you the Union, or the election campaign, the organizing campaign, or the Union activity that had taken place at Lewis Gardens?

"A. She alluded to it, but we never really discussed it.

"Q. How did she allude to it?

"A. 'They caused us a lot of their trouble—a lot of our trouble.' And be that whatever context you want to take it. I don't know."

In her testimony Mrs. Babbitt nowhere directly admits she was informed of Hickey's union involvement by Mrs. Lewis. On the other hand, she never really denies it either. Instead, Mrs. Babbitt appears to be trying to evade the question, as demonstrated by answers such as "I don't remember," "might have made mention of it," and "alluded to it."

The fact Mrs. Lewis had knowledge of Hickey's union activity is not contested. From Mrs. Babbitt comes the information Mrs. Lewis had a tendency to talk about "everyone and everything" and was still "very concerned" about the union. Considering all of these circumstances, the ALO's inference Mrs. Lewis did inform Mrs. Babbitt of Hickey's union activity seems very reasonable—and not, as San Marcos argues, just "mere suspicion or surmise."

It would appear general counsel did present a prima facie case Hickey was discharged because of her union activity. The timing of the discharge and Mrs. Babbitt's comments to Hickey can reasonably be seen as evidence Hickey was discharged for unlawful reasons.

San Marcos did not disprove this conclusion, and did not prove Hickey would have been discharged regardless of union considerations. No explanation was given for Hickey's discharge; instead, Mrs. Babbitt claimed she quit. This claim the ALO did not credit; a reasonable determination, given some support by the previously mentioned pink slip given to Hickey by Mrs. Babbitt.

The Board's finding Hickey was unlawfully discharged, while based on inference and circumstantial evidence, is not unreasonable and is supported by substantial evidence.

### B. *Salvador De Casas*

De Casas was one of the six employees working at Lewis Gardens when Babbitt took over. He had been employed by the Lewises since 1976, doing general nursery work—sorting, watering, transplanting, and transporting plants. Like Hickey, De Casas had been active in the UFW organizing committee at Lewis Gardens. On February 19, 1979, De Casas was fired by Mrs. Babbitt. The ALO found De Casas was discharged because of his union activities.

As with Hickey, San Marcos contends there was no evidence Mrs. Babbitt had any knowledge of De Casas' union activity. On this point, the ALO found De Casas "had been active in the UFW organizing committee. Larry

Montano was aware of this and I find that he made Virginia Babbitt aware of it at their interview immediately prior to De Casas' termination."

Larry Montano worked for Lewis Gardens and was hired by Mrs. Babbitt to work at the nursery. He was interviewed for the position by Mrs. Babbitt on February 19, the same day De Casas was fired. Montano testified he told Mrs. Babbitt De Casas was a "troublemaker," but claimed he made no mention of De Casas' union activity.

However, Montano also admitted having previously told general counsel he *did* inform Mrs. Babbitt of De Casas' union involvement at the interview. Montano explained his retraction by claiming he had lied to general counsel in order to "get back" at Mrs. Babbitt, who he thought had accused him of being a thief on an earlier occasion. At the hearing, however, he was under oath, and stated he wanted to tell the truth.

The ALO did not believe Montano's retraction. First, the ALO noted, Montano admitted having spoken to Mrs. Babbitt after he talked with general counsel, before he testified. Also, he found it suspicious Montano waivered when confronted with his retraction, and admitted to having told Mrs. Babbitt De Casas was a "troublemaker." The ALO found the circumstances of Montano's retraction negated its credibility.

The ALO erred in finding Montano had "waivered" about labeling De Casas a "troublemaker"—he had admitted doing this *before* he was confronted with his changed story.[2] The ALO did not, however, appear to put much weight on this supposed waivering in his testimony. His decision to believe Montano's original story, as told to general counsel, is neither incredible on its face nor inherently improbable, and must be accepted. This being the case, there is substantial evidence Mrs. Babbitt was aware of De Casas' union activity. Mrs. Babbitt's supposed lack of knowledge is the only point argued by San Marcos in support of its contention De Casas was not unlawfully discharged, but is insufficient to overcome the evidence establishing her knowledge.

Mrs. Babbitt gave only two reasons for her decision to discharge De Casas. She testified she had "bad vibes" about him at their first interview. She also said De Casas was a complainer, although she admitted to having

---

[2]Further, De Casas did not, as claimed by the Board in its brief, admit he "maybe" told Mrs. Babbitt De Casas was involved in bringing the union to Lewis Gardens. Instead, Montano testified he "personally" thought De Casas was belligerent. When asked if, *in his opinion,* De Casas was belligerent about the union, Montano replied "maybe."

had only two or three conversations with him. No other reason is given for her decision.

According to De Casas, when he was discharged he was told "the company was not happy with his work." He said no one at the nursery had ever previously complained about his work. No one at the hearing testified to any instances of poor work by De Casas.

The circumstances of De Casas' discharge are suspicious enough to conclude De Casas was a victim of Mrs. Babbitt's union animus. The timing of his discharge, on the same day as her interview with Montano, and Mrs. Babbitt's failure to give any reasonable explanation for it, when considered with her union problems including its demand to negotiate, allow a reasonable inference De Casas was fired because of his union activity at Lewis Gardens. The Board's finding De Casas was discriminately discharged is supported by substantial evidence in the record.

### C. *John Martinez*

John Martinez began working for the Lewises as a maintenance man in July 1976. By the time of his layoff, October 1978, he was in charge of packing and shipping. February 5, 1979, he was hired by Mrs. Babbitt to work at the nursery. He was fired six working days later, February 12. The ALO found Martinez' discharge was, at least in part, the result of his union activity at Lewis Gardens, and so unlawful. Of the ALO's three unlawful discharge findings, this presents the closest question.

By all accounts, Martinez had been the most active union supporter at Lewis Gardens. He was responsible for obtaining union authorization cards, and for general liaison with the union. He was chosen to be the president of the UFW organizing committee.

The ALO found Mrs. Babbitt was aware of Martinez' union activity: "Mrs. Babbitt testified that Mrs. Lewis told her that Martinez was 'dishonest' and a 'bad worker,' but claims his union activity was never discussed. As with Hickey, I find it difficult to believe that his role was not alluded to."

As with Hickey, San Marcos challenges this finding. On this Mrs. Babbitt's testimony is less equivocal—she unmistakably claimed to have no knowledge of Martinez' union activity. But, even though the inference is not as compelling as in Hickey's case, the evidence can still be seen as supporting a reasonable inference Mrs. Lewis did inform Mrs. Babbitt of

Martinez' union involvement. (See discussion in section on Hickey's discharge.)

The circumstances surrounding Martinez' discharge are given in two very different versions; one by Mrs. Babbitt, and confirmed by her assistant, Philippe Bayonet, the other by Martinez, backed up by Mary Hickey. According to Mrs. Babbitt's version, Bayonet had been told to make sure no shipments left the nursery without an invoice being made. On February 12, Mrs. Babbitt came to the nursery and saw Martinez loading up an unmarked van. Seeing no invoice, she told Bayonet to check the van, but it left before he could do so.

Mrs. Babbitt testified she asked Martinez about the shipment, but he "wouldn't open up his mouth." She became very angry at Martinez' refusal to answer, and told him to "pick up his check." A later search for the invoice turned up nothing, and when Martinez came to the office he was given a termination slip.

Martinez denies any such incident involving an unmarked van ever occurred. He claims he was called into the office on the 12th and told his position was "no longer available." In fact, he was given a pink slip which said "Position no longer available." He asked Mrs. Babbitt about a future job, and she said, "At this time I don't know what I'm going to do about the nursery." Hickey, who was present at the time, corroborates Martinez' account of the events in the office.

The ALO found Martinez' version of the discharge was the true one. Although Martinez' credibility was "not beyond reproach," his account was backed up by Hickey, who the ALO found credible. On the other hand, Mrs. Babbitt's testimony he found too likely to be influenced by her business interests and her witness struck the ALO "as an underling who could be counted upon to do—and say—what was expected of him." The ALO's credibility resolutions are neither incredible on their face nor inherently improbable, and so must be accepted by this court.

There is evidence which would allow an inference Martinez was discharged for unlawful reasons. The timing of his firing was more than just suspicious—only six working days after Martinez started. Martinez, as a former Lewis Gardens employee, was very active in the union and there was testimony by Mrs. Babbitt from which the inference she knew of this activity could be drawn. Accepting the ALO's determination Martinez was not fired for the reasons given by Mrs. Babbitt, no justification was given for his discharge. This evidence, when considered with the evidence of a

discriminatory campaign against former Lewis Gardens employees at the nursery, can be viewed as substantial, if not overwhelming evidence Martinez was unlawfully discharged.

The ALO, however, proceeds to confuse the issue somewhat with the following comments: "I cannot, however, entirely discount Mrs. Babbitt's claim that she believed Martinez was involved in theft. The trouble is that it was mixed up in her mind with hostility toward the union. The two fed upon each other. I conclude that her preemptory haste in discharging Martinez without confrontation or investigation would not have occurred but for his suspected union sentiments.

"[T]he legal question is whether his discharge would have occurred *but for* her anti-union bias. . . . I conclude that preemptory haste in terminating him—without first confronting him and fully investigating the situation— would not have happened but for his union sentiments. I cannot gainsay at this late date whether he was actually involved in theft or not; he may have been. What I can say is that, because of his union sympathies, he was deprived of the opportunity to vindicate himself and that is a sufficient basis upon which to premise a violation."

The only possible involvement in theft on Martinez' part which the ALO mentions is the incident with the missing invoice and the unmarked van. But the ALO credited Martinez and Hickey's testimony, and Martinez said the incident with the unmarked van never occurred. It is not made clear, then, exactly what the ALO expected Mrs. Babbitt to "investigate" or "confront" Martinez about.

If the incident with the unmarked van did occur, and Mrs. Babbitt did, as the ALO concedes, suspect Martinez of stealing from the nursery, Martinez' discharge is clearly legal. An employee suspected of stealing, who refuses to comment when confronted in a situation appearing to involve theft from the employer, should not be able to claim he would not have been fired "but for" his union activity (see *Royal Packing Co.* v. *Agricultural Labor Relations Bd.* (1980) 101 Cal.App.3d 826, 833 [161 Cal.Rptr. 870]).

The evidence minimally supports the Board's finding the firing of Martinez was with cause.

*Discriminatory Refusals to Hire*

In September of 1978, the UFW petitioned for a representation election at Lewis Gardens' Vista location. An election was held September 21, 1978,

and the UFW won by a vote of 23 to 0. January 18, 1978, the UFW was certified as the bargaining representative for agricultural employees at the Vista nursery, and on January 24, Cesar Chavez wrote to the Lewises requesting negotiations begin.

The letter was received by the Lewises shortly after the agreement to sell the nursery to Babbitt had been reached. It was brought to Mrs. Babbitt's attention, but she apparently thought the matter to be between the UFW and the Lewises only. The Lewises' son, Donald, urged Mrs. Babbitt to get legal advice regarding the letter, however, and she did inquire about the matter.

In early February Mrs. Babbitt flew to San Francisco and met with attorneys from the firm of Bronson, Bronson and McKinnon. Pursuant to their advice, Mrs. Babbitt had Donald Lewis send a letter to the UFW, informing them the business had been sold and the new owner was seeking guidance concerning the request to bargain.

On February 16 the UFW wrote directly to Mrs. Babbitt, contending she was a successor to Lewis Gardens and demanded bargaining begin. After receiving the letter Mrs. Babbitt again sought legal advice. She then sent a letter to the UFW, claiming neither she nor Babbitt Engineering was a successor to Lewis Gardens, and declining to bargain with the union.

This refusal to bargain led to the filing of unfair labor practice charges by the UFW. One of the charges alleged the employer had engaged in a discriminatory campaign to "discourage" former employees of Lewis Gardens in an effort to defeat its duty to bargain with the UFW.

One of the factors looked at to determine if the purchaser of a business succeeds to the seller's duty to bargain with a union is whether there is a substantial "continuity in the identity of the work force across the change in ownership." (*Howard Johnson Co.* v. *Hotel Employees* (1974) 417 U.S. 249, 263 [41 L.Ed.2d 46, 57, 94 S.Ct. 2236, 2244].) The ALO held Mrs. Babbitt had refused to hire former employees of Lewis Gardens in an attempt to prevent a finding of "workforce continuity" and thus attempt to defeat a finding of successorship. The Board affirmed this holding. San Marcos argues there is not substantial evidence in the record to support such a finding.

When Babbitt purchased the stock of Lewis Gardens, only six employees were working at the Vista location. They were all kept on the payroll. The first new employee hired by Mrs. Babbitt was Raul Vega, an experienced

grower who had just left a neighboring nursery, Ruline. Knowing she needed additional employees at once, Mrs. Babbitt authorized Vega to hire four workers who had been with him at Ruline, and put her personal driver and gardener, Philippe Bayonet, on the payroll. Mrs. Babbitt also gave Vega permission to look for more employees for the nursery.

Up to this point, the ALO determined, little or no consideration had been given to hiring former Lewis Gardens employees. This was not the result of any illegal motivation, but because of the necessity of hiring employees quickly to get the nursery operational again. But the ALO also found Mrs. Babbitt soon realized she would need quite a few more employees, and she believed it would be helpful to find workers with experience at Lewis Gardens (no evidence in support of the latter assumption is given by the ALO). The next two hirings were of former Lewis Gardens employees, Mary Hickey and John Martinez.

A few days after hiring Hickey and Martinez, Mrs. Babbitt took her trip to San Francisco to consult with her attorneys. The majority makes much of the fact that immediately upon her return Mrs. Babbitt ordered Vega to stop all hiring. From that point on, all hiring was done by her alone. She testified this was due to her need to think over the nursery's financial condition, as she had just discovered the azalea crop was diseased.

The ALO did not believe this explanation. While it could account for a decision not to hire 40 employees which Vega had said would be needed, it did not justify a failure to hire at least a few more employees to care for an already neglected and damaged crop. Instead, the ALO believed Mrs. Babbitt came back from her trip to San Francisco determined not to hire former Lewis Gardens employees. The ALO surmised Mrs. Babbitt either was given an understanding of successorship and "workforce continuity" by her attorneys there, or at least was made aware the union could not be ignored and a renewed unionization drive at the nursery was possible. This is pure speculation unsupported by any evidence.

About this time a number of incidents occurred which the ALO assumed evidenced Mrs. Babbitt's growing concern with workforce continuity. Mary Hickey, an office worker at the nursery, testified to a conversation in which Mrs. Babbitt said, with regard to the union, she had "inherited a bag of worms." Mrs. Babbitt then said she was not against the union, but her employees did not need one as she treated them fairly. On February 14, Hickey, a former Lewis Gardens employee, was discharged by Mrs. Babbitt. According to Hickey, Mrs. Babbitt told her it was "nothing that I had

done as far as my job went, but it was very bad timing for me to be there at that time. . . ."

Another employee at the nursery, D. J. Lewis, not related to the owners of Lewis Gardens, testified to an incident where Mrs. Babbitt received a phone call from the union. The call upset her very much, and according to Lewis she told the caller, "Things are really fucked up around here, and I'm going to get to the bottom of it."

Mrs. Babbitt also thought some of her employees were stealing from her and she apparently believed the union was behind the theft. The ALO admitted she had good justification for believing theft had occurred but did not believe the thefts were at the instance of the union. In February of 1979 she phoned Vega demanding an immediate armed guard for the nursery at night to prevent "union sabotage." In mid-March she had a deputy from the San Diego Sheriff's office come to the nursery to investigate the alleged thefts. According to the deputy, Mrs. Babbitt said she believed Vega and John Martinez were responsible for the thefts. As noted above, the ALO had a feeling this was justified though it questioned whether the thefts were union inspired. She said Vega and Martinez were "[u]nion workers; and that she had a non-union place of business; and that Vega and Martinez were attempting to talk to the workers to get them into a union-type structure."

As we noted above, between February 12 and February 19 Mrs. Babbitt fired three former Lewis Gardens employees. The three had been active in the UFW organizational drive at Lewis Gardens. The ALO found the three discharges, which I discussed in detail in the preceding section, were made by Mrs. Babbitt because of antiunion considerations.

The discharges and her antiunion animus led the ALO to conclude Mrs. Babbitt had consciously adopted a hiring policy aimed at discriminating against employees of Lewis Gardens. As we have noted, the firing of these people may have resulted from union animus, but these firings do not supply an inference of a plan *not to hire*.

From the time Mrs. Babbitt got back from her trip to San Francisco until March 31, 1979, 19 employees were hired. Three of those nineteen were former Lewis Gardens employees; of those three, two had worked there before the UFW election was held, and one had been a supervisor. Between April 1 and June 30, 1979, another 26 employees were hired; 1 was a former Lewis Gardens employee. The evidence is clear no former employee of Lewis Gardens who requested employment of Mrs. Babbitt was denied

work. It is interesting to note, too, of the six Lewis Gardens employees originally hired, the record reveals only De Casas was discharged.

Vega testified to having talked to approximately 12 former Lewis Gardens employees who were looking for work at the nursery. Mary Hickey testified she heard from eight former Lewis Gardens employees regarding employment.[3] Neither of these people were in a supervisory position at the time the inquiry was made and neither ever had authority to hire or fire personnel. The testimony was clear none of these names were specifically brought to Mrs. Babbitt's attention.

Another former Lewis Gardens employee, Duayne Giron, testified to having asked one of the foremen at the nursery, Larry Montano, about getting work there. Montano allegedly told Giron he would not be able to work there because he had worked at Lewis Gardens. The ALO referred to Montano as a "supervisor" but that statement was totally without evidentiary support. Montano himself stated he was only a "foreman" and had never been in a position to hire or fire personnel. His duties as a foreman were never sought out nor explained anywhere in the record.

In the cases of the discharges of Hickey, De Casas and Martinez, the evidence relied on by the ALO and the Board could constitute an unfair labor practice prohibited by section 1153, subdivision (c) of the act as I have conceded above, but a review of the entire record makes it clear there is not substantial evidence to support the ALO's finding that there was a discriminatory pattern not to hire Lewis Gardens employees.

To summarize, I believe the hiring pattern at the nursery does not evidence a discriminatory campaign not to hire Lewis Gardens employees. In effect the first six employees hired by Mrs. Babbitt were Lewis Gardens employees—she retained five of the six who are apparently still working at the nursery. She soon afterwards hired Hickey and Martinez, both former Lewis Gardens employees.

These last two hirings were, of course, before Mrs. Babbitt consulted with her attorneys in San Francisco regarding the UFW's request to bargain. After this meeting, however, during which she may have acquired an understanding of the "successorship" question as the ALO and the Board surmised, four former Lewis Gardens employees were hired through June of 1979. *Three of the employees hired before Mrs. Babbitt's trip to San*

---

[3]Mary Hickey named Patricia Daltorio, Conrado Luna, Andres Gonzales, Reynaldo De Casas, Larry Montano, Pedro Gonzales, Socorro Vega and Dorothy Van Ginder.

Francisco, however, were discharged shortly after it. That hardly speaks of a *"hiring"* discrimination plan.

The ALO found Raul Vega had received a "number of calls" from former Lewis Gardens employees who were looking for work at the nursery. He also found Hickey had received eight such calls. However, the ALO nowhere expressly found Mrs. Babbitt who was the person responsible for hiring was ever informed of any of these calls. Hickey said she left notes on Mrs. Babbitt's desk but does not state what the notes said or whether the desire for work for specific persons was spelled out in the notes. The absence of this nexus precludes a finding by the ALO or the Board of knowledge of request for work, so the callers not getting jobs cannot be said to be part of a discriminatory campaign. In order to properly reach that conclusion, I submit the record must show Mrs. Babbitt was aware of the calls received by Vega and Hickey, knew the persons referred to were former Lewis Gardens employees and purposely did not hire them for that reason. In contrast, the record shows that with one exception Mrs. Babbitt hired every Lewis Gardens employee she was aware desired employment.

Raul Vega stated he never told Mrs. Babbitt about the calls he received from former Lewis Gardens employees nor did he leave a note. At one point he was asked about the hiring of employees for the nursery at the outset of the operation. He testified Mrs. Babbitt gave him permission to hire former Lewis Gardens employees, but then later told him not to hire *anyone* until she talked with her attorney.

"Q: Did you have any further occasion to discuss hiring with Mrs. Babbitt?

"A: Yes. On the following days or continuing days I asked her if she had spoken to her attorney as to what we should do, because some employees who had worked with Ruline—

"Ms. Dudley: Huh-uh.

"The Interpreter: I mean, 'who had worked with Lewis Gardens.'

"The Witness: (Through interpreter)—and others who had not worked there had come. And I had already taken their names and telephone numbers, and I was just waiting for her to say 'Do it' so that we'd have—so as to form a group of employees that could work efficiently in the business."

The manner in which this is phrased does not make it clear whether Vega actually told Mrs. Babbitt about the people, including Lewis Gardens em-

ployees, who were looking for work. On the other hand, during Vega's cross-examination, the subject of the calls from former Lewis Gardens employees is again brought up.

"Q: Now you told Mrs. Babbitt, didn't you, about these people that were applying for jobs and what their names were?

"A: No."

These two statements by Vega are the only evidence as to whether he informed Mrs. Babbitt of the calls he received from former Lewis Gardens employees. Neither were developed by counsel and it is apparent there is no substantial evidence she refused to hire Lewis employees who requested work.

The ALO found Vega to *not* be a very credible witness on many points. Despite these findings, the ALO relied on Vega's testimony as to receiving calls regarding employment from former Lewis Gardens employees. There is no reason why the ALO could not reasonably credit portions of a witness' testimony while discrediting other portions, credibility determinations being within the province of the Board and not subject to being disturbed absent a showing the credited testimony is incredible on its face, or is inherently improbable (*Perry Farms, Inc.* v. *Agricultural Labor Relations Bd.* (1978) 86 Cal.App.3d 448, 463-464 [150 Cal.Rptr. 495]). The fact remains, however, nothing in Vega's testimony nor that of anyone else establishes the necessary relaying of his information to Mrs. Babbitt.

It is also noteworthy Vega could only remember the names of two of the former Lewis Gardens employees who spoke to him about work, Larry Montano and John Martinez. Interestingly, both were hired by Mrs. Babbitt.

Mary Hickey testified to having told Mrs. Babbitt about one of the callers, Dorothy Van Ginder, and Van Ginder was not hired but the record does not reveal whether she was qualified or why she was not hired. The record also fails to disclose whether she was really interested in work. Hickey also said she did not personally tell Mrs. Babbitt about any of the other calls.

Mrs. Babbitt was in charge of hiring at the nursery, and there was no evidence she ever told anyone not to inform her of employment inquiries from former Lewis Gardens employees. There also was no evidence Mrs. Babbitt learned of Lewis Gardens employees looking for work from any source other than Vega and Hickey. With the exception of Van Ginder, the record shows Mrs. Babbitt hired all of the former Lewis Gardens employees

she knew were seeking work at the nursery. If Mrs. Babbitt did not know of any others looking for work, the ALO's finding of a discriminatory hiring pattern cannot stand. A new employer is free to select its own workforce and has no duty to actively seek out employees who previously worked for its predecessor (*N L R B* v. *Burns Security Services* (1972) 406 U.S. 272 [32 L.Ed.2d 61, 92 S.Ct. 1571]).

The hiring pattern, when considered with the other evidence, I believe negates a finding Mrs. Babbitt engaged in a discriminatory campaign to refuse to hire former Lewis Gardens employees.

*Successorship*

As previously noted, the UFW was certified to represent the agricultural employees at Lewis Gardens' Vista location shortly before the nursery was sold to Babbitt. After an exchange of correspondence, Mrs. Babbitt wrote the UFW, contending the corporation was not a successor to Lewis Gardens, and refused to bargain with the union. The ALO, however, found Babbitt did succeed to Lewis Gardens' duty to bargain with the UFW, and so violated the act by its failure to do so. We note again here that since there was no alter ego established, the finding only apply to San Marcos at the very most.

Neither the ALRA nor the NLRA contain any specific statutory provision dealing with the successorship issue. The cases decided under the NLRA, however, have come to recognize the fundamental purposes of the act require the purchaser of a business to, in some circumstances, assume the statutory obligations of its predecessor.

No single mechanical formula has been devised for determining whether an employer has succeeded to the bargaining obligations of its predecessor. In this context, the court in *Howard Johnson Co.* v. *Hotel Employees, supra,* 417 U.S. 249, 256 [41 L.Ed.2d 46, 53, 94 S.Ct. 2236, 2240], explained: "[W]e must necessarily proceed cautiously in the traditional case-by-case approach of the common law. Particularly in light of the difficulty of the successorship question, the myriad factual circumstances and legal contexts in which it can arise, and the absence of congressional guidance as to its resolution, emphasis on the facts of each case as it arises is especially appropriate."

However, a number of factors have come to be recognized as guideposts for determining whether an employer has succeeded to its predecessor's duty to bargain: "These factors include, *inter alia,* consideration of the

continuity of workforce, continuity of business operations, similarity of supervisory personnel, similarity of product or service, similarity in methods of production, sales and inventorying, and use of the same plant." (*N. L. R. B.* v. *Security-Columbian Banknote Co.* (3d Cir. 1976) 541 F.2d 135, 139.) The cases decided under the NLRA have come to view as one of the most important considerations the continuity of the workforce—the number of employees in the bargaining unit who had also worked for the predecessor employer (*Howard Johnson Co.* v. *Hotel Employees, supra,* 417 U.S. at pp. 263-264 [41 L.Ed.2d at p. 57, 94 S.Ct. at pp. 2243-2244]).

In *San Clemente Ranch, Ltd.* v. *Agricultural Labor Relations Bd., supra,* 29 Cal.3d 874, the California Supreme Court first dealt with the successorship issue under the ALRA. The court agreed with the cases decided under the NLRA holding a new employer must in some circumstances succeed to its predecessor's duty to bargain with a union. However, the court also noted some of the unique aspects of the agricultural setting—such as the seasonal nature of employment, the migration of employees, and the unskilled nature of the work—and held considerations in addition to "workforce continuity" should generally play an important role in determining successorship liability under the act (*id.* at pp. 890-891). Unlike the workforce in *San Clemente,* we are here dealing with a relatively stable, year-round employment pattern. The majority characterizes the six-person workforce when San Marcos took over as a "low ebb." This was an "ebb" resulting from Lewis' business failure and not from seasonable workload. The six-man workforce was the full complement of year-round employees when San Marcos began the operation and San Marcos hired them all, then proceeded to build up the workforce to a new level of employees based on the need under the new management's program.

The ALO, whose decision was issued before *San Clemente Ranch* was decided, emphasized the workforce continuity factor in finding Babbitt had succeeded to Lewis Gardens' duty to bargain. The Board, while rejecting the ALO's "overly mechanistic analysis concerning the factor of workforce continuity," affirmed the ALO's conclusion.

With regard to workforce continuity, the court in *NLRB* v. *Burns Security Services, supra,* 406 U.S. 272, 294-295 [32 L.Ed.2d 61, 77, 92 S.Ct. 1571, 1586], stated: "[T]here will be some instances in which it is perfectly clear that the new employer plans to retain all of the employees in the unit and in which it will be appropriate to have him initially consult with the employees' bargaining representative before he fixes terms. In other situations, however, it may not be clear until the successor employer has hired his full

complement of employees that he has a duty to bargain with a union, since it will not be evident until then that the bargaining representative represents a majority of the employees in the unit . . . ."

From this language comes the concept workforce continuity cannot be determined until a full complement of employees have been hired by the new employer. As the court noted in *San Clemente Ranch, Ltd.* v. *Agricultural Labor Relations Bd.*, *supra*, 29 Cal.3d 874, 888-890, "full complement" does not necessarily mean "peak employment." This is especially true in the agricultural setting, where great seasonal fluctuations in workforce could result in peak employment not being reached for many months after a change in ownership. Waiting until peak employment is reached to determine a new employer's duty to bargain could deprive agricultural employees of the benefits of representation for a substantial period of time.

The ALO in this proceeding did not wait until peak employment had been reached at the nursery to determine if Babbitt had a duty to bargain with UFW; instead, he waited until there was a representative complement of workers. The ALO found there was not such a complement when Babbitt first took over the nursery—only six employees were then working, and it was clear Babbitt intended to hire more employees soon.

The ALO determined a representative complement of employees had been reached by the beginning of March 1979. During February the workforce had increased from 12 to 22; it then stabilized and remained constant until the end of March. This stabilization, the ALO reasoned, indicated the nursery was receiving at least the minimal attention it needed, and had reached a representative complement of employees. The ALO also felt it was of some significance the number of employees at the beginning of March was very close to the number of employees who were at Lewis Gardens at the time of the representation election. In light of these factors, the ALO's choice of the beginning of March as the date on which workforce continuity should be determined is certainly not unreasonable and is a matter best left to the expertise of the Board. I cannot disturb that finding.

Of the 22 employees at the nursery on March 1, only 7 were former Lewis Gardens employees. Looking only at workforce continuity, then, it would appear San Marcos did not succeed to Lewis Gardens' duty to bargain with the UFW—a majority of its employees had not worked at Lewis Gardens.

The union argues, however, an employer who engages in a campaign to refuse to hire its predecessor's employees, for the purpose of obviating a successorship finding, has committed an unfair labor practice. In such a situation, an order to reinstate the predecessor's employees who were dis-

criminated against is appropriate. And, when such a discriminatory campaign has been established, workforce continuity can be *presumed. (Rivcom Corp.* v. *Agricultural Labor Relations Bd.* (1983) 34 Cal.3d 743, 764 [195 Cal.Rptr. 651, 670 P.2d 305]; *K. B. & J. Young's Super Markets, Inc.* v. *N. L. R. B.* (9th Cir. 1967) 377 F.2d 463, 465 (cert. den. 389 U.S. 841 [19 L.Ed.2d 105, 88 S.Ct. 71].)

Seven of the twenty-two employees at the nursery on March 1 had worked at Lewis Gardens. Three other former Lewis Gardens employees (Hickey, De Casas and Martinez) had been unlawfully discharged. This totals 10, less than half of the workforce. Hickey named eight former Lewis Gardens employees who were looking for work at the nursery[4] and Vega thought there were more. However, as we have noted above, since none of these persons come forward or were denied work, their request for work never having been shown to have been submitted to Mrs. Babbitt, they cannot be said to be included in the workforce of San Marcos. Given this evidence, the ALO could not presume the majority of the workforce at Babbitt would have been composed of former Lewis Gardens employees, so the finding of successorship must fail.

San Marcos argues the ALO, in his concentration on workforce continuity, ignored evidence of substantial changes in the operation of the nursery after Babbitt took over, changes which made the bargaining unit no longer appropriate. As I have noted above, the changes in the business operation, management, size of staff and procedure were substantial, and the ALO's conclusion in this regard totally ignores the record of uncontested facts relating to San Marcos' business.

The ALO found there was an eventual change in the product line at the nursery, but this did not begin until August 1979, and was still incomplete at the time of the hearing. The need and planning for such a change had to predate that. While the skills required for the new product line were essentially the same as those required for the old product line, the employees were essentially unskilled. Even the marketing of the plants changed. It was in fact and in effect a very different business.

In my view, there was no substantial evidence to hold San Marcos was the successor employer to Lewis Gardens.

---

[4]When Larry Montano, named by Hickey but also hired by Mrs. Babbitt February 26, is considered, the number of Hickey-named work seekers drops to seven and the significance of her testimony lessens accordingly.

*Remedy*

*Duayne Giron*

In his recommended remedy the ALO included Duayne Giron, a former Lewis Gardens employee, who the ALO concluded was one of the victims of the discriminatory campaign at the nursery. Giron never actually applied for work at the nursery, nor did he even call or visit the nursery to inquire about a job.

Instead, Giron had asked one of the employees at the nursery, Larry Montano, about getting work there. Montano, a friend of Giron's and the cousin of Giron's wife, allegedly told Giron he would not be able to get a job at the nursery because he had worked at Lewis Gardens. Because of this, Giron did not attempt to get a job at the nursery. The ALO apparently felt this was enough to include Giron in the remedy for those who were victims of the discriminatory campaign at the nursery.

San Marcos attacks this finding on two grounds. First, it argues, Montano denied he was ever asked by Giron about work at the nursery, and denied he ever said anything about Mrs. Babbitt not hiring former Lewis Gardens employees. The ALO, however, specifically found Giron's testimony to be credible, and found Montano not to be a trustworthy witness. Credibility resolutions are in the domain of the ALO, and as his determination is neither incredible on its face nor inherently improbable, it will not be disturbed on appeal.

Second, San Marcos points out Giron never applied, formally or informally, for a job at the nursery. There is no evidence Mrs. Babbitt was ever aware Giron was looking for work. "The elements of proof of an unfair refusal to rehire charge are the employee *applied for an available position* for which he was qualified and was unequivocally rejected, primarily because of union support. (*Kawano, Inc.* v. *Agricultural Labor Relations Bd.,* supra,* 106 Cal.App.3d 937, 943 (italics added).) As Giron at no time applied for a job at the nursery, Babbitt contends, he cannot be included in the remedy.

There is, however, authority for the proposition a discriminatee need not formally apply for work if to do so would be futile. "When a person's desire for a job is not translated into a formal application solely because of his unwillingness to engage in a futile gesture he is as much a victim of discrimination as is he who goes through the motion of submitting an application." (*Teamsters* v. *United States,* 431 U.S. 324, 365-366 [52

L.Ed.2d 396, 434, 97 S.Ct. 1843, 1870]; see also *N. L. R. B.* v. *Park Edge Sheridan Meats, Inc.* (2d Cir. 1963) 323 F.2d 956; *Piasecki Aircraft Corporation* v. *N. L. R. B.* (3d Cir. 1960) 280 F.2d 575 (cert. den. 364 U.S. 912 [5 L.Ed.2d 365, 81 S.Ct. 380]).) In these cases, however, the employer made it somewhat clear the employees discriminated against would not have a chance of being hired. As stated in *Kawano, Inc.* v. *Agricultural Labor Relations Bd., supra,* 106 Cal.App.3d at page 952: "[I]f an employer *unequivocally and publicly* promulgates his unconditional refusal to rehire a certain category of employees, proof of such promulgation excuses the need to prove individuals in the category made application for rehire which would under the circumstances have been futile." (Italics added.)

Unquestionably, Mrs. Babbitt never publicly pronounced her refusal to hire Lewis Gardens employees. The issue here, then, is whether Montano's statement was enough for Giron to reasonably conclude it would be futile to apply, and so excuse his duty to do so.

To allow Giron to be included in the remedy seems to drop the threshold of an acceptable case below present practice. As previously discussed, Mrs. Babbitt did hire six Lewis Gardens employees at the outset and later, between the time she took her trip to San Francisco in February 1979, and June 30, 1979, she hired four more. Thus, it cannot be said Giron had absolutely no chance of being hired if he applied.

Giron was told by one of San Marcos' employees he had no chance of getting a job at the nursery. An employer is responsible for the statements of its "supervisors," even if unaware of them, unless it repudiates those statements (*Merrill Farms* v. *Agricultural Labor Relations Bd.* (1980) 113 Cal.App.3d 176, 183 [169 Cal.Rptr. 774]). It would seem reasonable for a person to conclude it was futile to apply if one of the employer's *supervisors* told him it would be. Montano, however, was not and never had been a supervisor at San Marcos. He was only described as a foreman and testified he never had authority to hire or fire. Nothing else in the record indicates what his authority was or might be assumed to be (see § 1140.4, subd. (c)). Under these circumstances, it is not proper to find Giron was reasonably justified in his belief it would be futile to seek employment.

*People Not Named in Complaint*

The ALO found eight people were victims of Babbitt's campaign to refuse to hire former Lewis Gardens employees. Babbitt was ordered to offer employment to the eight, Reynaldo De Casas, Patricia Daltorio, Dorothy Van

Ginder, Duayne Giron, Andres Gonzales, Pedro Gonzales, Conrado Luna, and Socorro Vega, and to make them whole for any lost pay or benefits.

The eight were never mentioned in the complaint, the prayer for relief, or in general counsel's responses to discovery requests. To impose make-whole relief for these eight, I believe, is an abuse of discretion.

The Board concedes the eight were not specifically mentioned in the complaint. However, paragraph 12 of the complaint charges Mrs. Babbitt: "[E]ngaged in a discriminatory campaign to discourage and/or terminate former employees of Lewis Gardens, Inc. *including but not limited to* John Martinez, Salvador de Casas, and Mary Hickey—in an effort to avoid its obligation to bargain with the UFW." (Italics added, dashes in original.)

I believe minimal due process requires a person charged with an unfair labor practice be given more specific notice than such vague description. I would concede, however, the record is unclear just how San Marcos was prejudiced in this case. Moreover, in any event, since I believe there is no substantial evidence of a discriminatory campaign by San Marcos and it is not a successor employer, it is my view these eight employees are entitled to no relief on the particular basis asserted.

*The Proper Award*

Since I would hold there was no discriminatory campaign not to hire Lewis Gardens employees and there was no successorship obligation to negotiate with the UFW, the make-whole award must fall, leaving only lost wages of the three discharged employees.

*Conclusion*

Insofar as the Board's decision holds San Marcos violated the act by discharging Mary Hickey, Salvador DeCasas and John Martinez, I would affirm. The remedial provisions relating to their reinstatement and backpay, and to the giving of notice of the proceedings regarding their unlawful discharge, are entitled to enforcement. I would, however, modify the Board's order by deletion of all references to Babbitt Engineering and Machinery, Inc. since there is no substantial evidence it was the alter ego of the employer charged here or otherwise accountable on a theory of agency or successor corporate entity. I would also modify the Board's holding petitioner San Marcos violated the act by their refusal to hire former employ-

ees of Lewis Gardens, and by failing to bargain with the UFW, by striking remedial measures imposed.

A petition for a rehearing was denied March 12, 1984. Cologne, J., was of the opinion that the petition should be granted. Petitioners' application for a hearing by the Supreme Court was denied May 16, 1984. Bird, C. J., did not participate therein.